THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LAWRENCE ROSANO, MICHAEL NEWMARK, THOMAS NAPLES, Also Known as TIM NAPLES, and VILLAGE MALL TOWN-HOUSES, INC., Appellants.

Second Department, August 6, 1979

APPEARANCES OF COUNSEL

*James M. La Rossa (Andrew B. Melnick* of counsel), for Lawrence Rosano and others, appellants.

*Lawrence S. Goldman (Andrew B. Melnick* of counsel), for Thomas Naples, appellant.

*Robert Abrams, Attorney-General (John M. Farrar* and *Robert Schonfeld* of counsel), for respondent.

## OPINION OF THE COURT

LAZER, J.

This appeal results from judgments convicting the defendants on various counts of a 224-count indictment relative to their alleged criminal misconduct in the course of the development of a 141-unit condominium project in the Bayside area of Queens County. Of the defendants, Village Mall Townhouses,

Inc. (Village Mall) is the corporate builder; Lawrence Rosano and Michael Newmark are officers and principals of Village Mall; and Thomas Naples has been variously labeled as its corporate controller and the secretary-treasurer. After the conclusion of an 18-day nonjury trial, the trial court rendered a written determination convicting all the defendants of 15 counts of larceny under section 79-a of the Lien Law (misappropriation of funds of trust), four counts of making apparently sworn false statements in violation of section 210.35 of the Penal Law, one count of violating sections 352-c, 352-e and 359-g of the General Business Law in connection with a public offering of securities and one count of violating sections 352-h and 359-g of the General Business Law for misappropriating trust funds. Village Mall, Rosano and Newmark were also convicted of one additional count of violating sections 352-c, 352-e and 359-g of the General Business Law.

## I. THE LARCENY COUNTS

Each of the defendants was convicted of disbursing for nontrust purposes building loan contract funds in the amount of $777,851 during the period October 31, 1973 to November 27, 1973 and funds advanced by contract vendees in the amount of $245,408.76 during the period September 19, 1973 to December 13, 1973, for a total of $1,023,259.76. The payments were made to the corporate principals, Newmark and Rosano, or to other corporations controlled by them.

In their brief, the defendants contend, *inter alia,* that the evidence would have been insufficient to sustain their convictions had the trial court not mistakenly treated their repayment defense to the larceny charges as an affirmative defense; that the court's reliance upon the presumption in subdivision 3 of section 79-a of the Lien Law was in error because that section is unconstitutional; and that further error was committed when the court refused to disregard the separate existence of the individual defendants' various business entities and when it held the individual defendants liable for the acts of the corporate defendant.

### A. THE REPAYMENT DEFENSE (LIEN LAW, § 79-A, SUBD 2)

The defendants' brief describes their repayment defense to the larceny charges as follows:

"At trial all of defendants relied on [the repayment defense

in subdivision 2 of section 79-a of the Lien Law] as a complete defense to the Lien Law violations charged. * * *

"The defendants at trial contended that under Lien Law Section 79-a (2), they were justified in repaying at least $850,000 of the construction loan funds to themselves, to entities they controlled, or to other entities they designated. Thus, the first $850,000 of monies expended from the trust funds for 'non-trust purposes' was justified. If the $850,000 figure is allowable, under either Altusky's [the People's witness] or the Court's computation, the defendants did not violate Lien Law Section 79-a(2)."

At the trial, the attorneys for the defendants declared that their clients were "justified in repaying" the mentioned sum of $850,000 for the acquisition of the land which Rosano and Newmark had purchased for $1,700,000. In furtherance of this position, they adduced the testimony of the mortgage broker who had helped defendants obtain a construction loan of $5,000,000. According to the broker's testimony, at a meeting in August, 1973, the lending institution's mortgage officer (who was also a vice-president of the institution), agreed that 50% of the value of the land or $850,000 of the 5 million dollar loan was to be "a land advance". However, when the mortgage officer had testified for the People, he refused to concede that the $850,000 was to be used as reimbursement for the cost of the land and instead insisted that a sum equal to half the value of the land was to be applied to "indirect construction items" or "soft costs" which he defined as including "interest, taxes, appraisal, brokerage fees" and commitment fees.

The repayment defense has its source in subdivision 2 of section 79-a of the Lien Law, which section provides:

"1. Any trustee of a trust arising under this article, and any officer, director or agent of such trustee, who applies or consents to the application of trust funds received by the trustee as money or an instrument for the payment of money for any purpose other than the trust purposes of that trust, as defined in section seventy-one, is guilty of larceny and punishable as provided in the penal law if

"(a) such funds were received by the trustee as owner, as the term 'owner' is used in article three-a of this chapter, and they were so applied prior to the payment of all trust claims as defined in such article three-a, arising at any time; or

"(b) such funds were received by the trustee as contractor or

subcontractor, as such terms are used in article three-a of this chapter, and the trustee fails to pay, within thirty-one days of the time it is due, any trust claim arising at any time; provided, however, that if the trustee who received such funds as contractor or subcontractor disputes in good faith the existence, validity or amount of a trust claim or disputes that it is due, the application of trust funds for a purpose other than a trust purpose, or the consent to such application, shall not be deemed larceny by reason of failure to pay the disputed claim within thirty-one days of the date when it is due if the trustee pays such claim within thirty-one days after the final determination of such dispute.

"2. Notwithstanding subdivision one of this section, if the application of trust funds for a purpose other than the trust purposes of the trust is a repayment to another person of advances made by such other person to the trustee or on his behalf as trustee and the advances so repaid were actually applied for the purposes of the trust as stated in section seventy-one, or if the trustee has made advances of his personal funds for trust purposes and the amount of trust funds applied for a purpose other than the trust purposes of the trust does not exceed the amount of advances of personal funds of the trustee actually applied for the purposes of the trust, such application or consent thereto shall be deemed justifiable and the trustee, or officer, or agent of the trustee, shall not be deemed guilty of larceny by reason of such application or by reason of his consent thereto.

"3. Failure of the trustee to keep the books or records required by section seventy-five shall be presumptive evidence that the trustee has applied or consented to the application of trust funds received by him as money or an instrument for the payment of money for purposes other than a purpose of the trust as stated in section seventy-one.

"4. Notwithstanding any other provision of law, no act of the trustee in relation to the assets of the trust shall, by reason of any express covenant as provided in section thirteen or section twenty-five of this chapter, be deemed larceny in a case in which it is not declared by subdivision one of this section to be larceny or in a case in which the act is deemed justifiable as provided in subdivision two of this section."

Subdivision 2 of section 79-a thus provides a trustee with a defense to the charge of larceny where his application of trust funds for a nontrust purpose is a repayment of an advance

*actually applied for a trust purpose* (Jensen, Mechanics' Liens [4th ed], § 175). The "purpose of the trust" as stated in section 71 of the Lien Law, is that the trust assets of which an owner is trustee "shall be held and applied for payment of the cost of improvement." "Improvement" as defined in subdivision 4 of section 2 of the Lien Law includes: "the demolition, erection, alteration or repair of any structure upon, connected with, or beneath the surface of, any real property and any work done upon such property or materials furnished for its permanent improvement, and shall also include any work done or materials furnished in equipping any such structure with any chandeliers, brackets or other fixtures or apparatus for supplying gas or electric light and shall also include the drawing by any architect or engineer or surveyor, of any plans or specifications or survey, which are prepared for or used in connection with such improvement and shall also include the value of materials actually manufactured for but not delivered to the real property, and shall also include the reasonable rental value for the period of actual use of machinery, tools and equipment and the value of compressed gases furnished for welding or cutting in connection with the demolition, erection, alteration or repair of any real property, and the value of fuel and lubricants consumed by machinery operating on the improvement, or by motor vehicles owned, operated or controlled by the owner, or a contractor or subcontractor while engaged exclusively in the transportation of materials to or from the improvement for the purposes thereof." "Cost of improvement", as defined in subdivision 5 of section 2 of the Lien Law, means: "expenditures incurred by the owner in paying the claims of a contractor, an architect, engineer or surveyor, a subcontractor, laborer and materialman, arising out of the improvement * * * and shall also include fair and reasonable sums paid for obtaining building loan and subsequent financing, premiums on bond or bonds filed pursuant to section thirty-seven of this chapter or required by any such building loan contract * * * sums paid to discharge or reduce the indebtedness under mortgages and accrued interest thereon and other encumbrances upon real estate existing prior to the time when the lien provided for in this chapter may attach, sums paid to discharge building loan mortgages whenever recorded, taxes, assessments and water rents existing prior to the commencement of the improvement, and also those accruing during the making of the improvement, and interest on building loan mortgages, ground rent and premi-

ums on insurance * * * The application of the proceeds of any building loan mortgage or other mortgage to reimburse the owner for any payments made for any of the above mentioned items for said improvement prior to the date of the initial advance received under the building loan mortgage or other mortgage shall be deemed to be an expenditure within the 'cost of improvement' as above defined; provided, however, such payments are itemized in the building loan contract and/or other mortgage other than a building loan mortgage, and provided further, that the payments have been made subsequent to the commencement of the improvement.''

■ Although sums paid in reduction or discharge of mortgages or other encumbrances upon real estate qualify as "cost of improvement" expenditures, research reveals no case which characterizes the original purchase price of the land upon which improvements are to be made as such a cost, and the explicit recital in the statute would appear to preclude such a construction (see *Zumbo v Town of Farmington,* 60 AD2d 350; McKinney's Cons Laws of NY, Book 1, Statutes, § 240). Since defendants claim that Newmark and Rosano advanced their own funds for the purchase of the land, the defendants' theory appears to be that the disbursements made to them and the other business entities which they controlled were for the purpose of reimbursing them for their purchase of the land. But since that purchase—even if actually paid for by Newmark and Rosano—was not a "cost of improvement" and thus not a trust purpose, the repayment defense cannot be asserted on the basis of it. If the separate existence of the individual defendants' various business entities is ignored, as the defendants urge, and the expenditures are categorized as repayments by the trustee to itself, the payments would not qualify as a cost of improvement even if they were within the definition in subdivision 5 of section 2 of the Lien Law. That section provides that reimbursement of an owner for payments made for improvements prior to the date of an initial advance under a building loan mortgage are deemed a cost of improvement *only* if such payments are itemized in the building loan contract. As the trial court noted: "the statement of the borrower, signed by Lawrence Rosano as its president, makes no mention of any agreement to repay the principals of VM [the corporate defendant] or anyone else for advances. Nor do any of the financial statements upon which the loan was granted refer to any agreement or claim of any person to repayment from the loan proceeds. The individual defendants

are precluded from asserting an agreement not reflected in these documents. Potential beneficiaries of the Lien Law trust had a right to believe that there would exist as of October 30, 1973, a trust corpus of $4,628,578.25, the balance after payment of closing expenses, for improvement of the real estate. No basis exists to deduct from that the sum urged by the defendants." Since the payments alleged were not made for trust purposes and were not listed in the construction loan contract, any suggestion that the lending institution agreed that trust funds could be so diverted would constitute a charge that it too violated the Lien Law (cf. *Aetna Cas. & Sur. Co. v Lafayette Nat. Bank of Brooklyn in N. Y.,* 28 NY2d 922; *Forest Elec. Corp. v Century Nat. Bank & Trust Co.,* 70 Misc 2d 190) and would not constitute a legal defense.

Our dissenting brother argues that by limiting the statutory repayment defense to preloan expenditures which are itemized in the loan documents "the trial court and the majority have rendered this provision totally superfluous and meaningless, and have effectively obliterated this defense in criminal prosecutions. By this interpretation the legislative intent and purpose of this defense are completely frustrated."

Our colleague contends that there is no evidence that the Legislature intended the itemization requirement in subdivision 5 of section 2 of the Lien Law to apply to the repayment defense. In support of this assertion, he points to the fact that the defense did not even exist until the enactment of section 1302-c of the former Penal Law in 1959 (see L 1959, ch 696). The dissent thus assumes that when the Legislature enacted section 1302-c it somehow overlooked the fact that subdivision 5 of section 2 of the Lien Law required itemization as a precondition of reimbursement. Actually, however, the legislative package which included section 1302-c of the former Penal Law also added additional language to subdivision 5 of section 2 of the Lien Law (see L 1959, ch 696, § 4). Thus, with both sections before it in 1959, the Legislature chose to leave the itemization requirement in subdivision 5 of section 2 unaltered.

The essence of the criticism leveled by the dissent on this issue is that the repayment defense is rendered "meaningless" if it is limited by the itemization requirement. But we believe that the limitation is consonant with the legislative intent to protect suppliers and contractors against diversion of trust funds by requiring trustees to make known to them in the

publicly filed agreements the sums which will be available for the payment of improvement costs from building loan advances (see *P. T. McDermott, Inc. v Lawyers Mtge. Co.,* 232 NY 336; *Realty Improvement Funding Co. v Stillwell Gardens,* 91 Misc 2d 718). Under the theory espoused in the dissent, the amounts set forth in the filed agreements would be of little consequence, for a trustee could help himself to trust funds without notice to prospective lienors and then—upon his failure to pay those whom the statute purports to protect— raise the defense of repayment.

But apart from whether itemization of their preloan expenditures was required, the defendants have not succeeded in raising the defense of repayment because they have not come forward with sufficient evidence to impose the burden of disproving it on the People (see Penal Law, § 25.00). None of the defendants took the stand, and of the two witnesses whose testimony was offered, only the mortgage broker testified concerning the building loan funds. As summarized in the defendants' brief, the mortgage broker "testified that in August, 1973 at a meeting with Callicut [lending institution mortgage officer], Rosano and Newmark, Callicut agreed that $850,000 of the funds to be loaned was loaned on the land." This testimony, plus the earlier cross-examination of the mortgage officer, was wholly insufficient to raise the defense of repayment because, giving it every favorable intendment, it neither established, nor tended to establish any element of the defense. As stated in the trial court's opinion, the defendants adduced no testimony of any advances by any person on behalf of the trustee, of any agreement to reimburse any person who may have made advances on behalf of the trustee, of any right in any transferee to repayment of an advance, or of an intention that the transfers were intended to be repayments of an advance by such transferees. Had the case been tried before a jury, the evidence would have been insufficient to warrant a charge on repayment and on this record it never shifted the burden of disproof to the People (cf. *People v Barkman,* 34 NY2d 624; *People v Dawson,* 53 AD2d 554, affd 42 NY2d 945).

Although we thus conclude that the defense of repayment is a specious issue on this appeal, we agree with defendants' contention that the defense qua defense is an ordinary one. Because the question of the nature of the defense will likely recur and *People v Rallo* (46 AD2d 518, affd 39 NY2d 217)

stands as the only judicial authority on the subject, it is appropriate for us to express our view.

In *Rallo,* the Fourth Department concluded that the repayment defense in subdivision 2 of section 79-a of the Lien Law is an affirmative defense, but its opinion constitutes dictum since the court actually held that the defense was not available to the defendant because the evidence showed that the payments at issue were not repayments. The rule of *stare decisis* does not apply to dicta (see *Stokes v Stokes,* 155 NY 581). The decision of the Court of Appeals did not discuss the issue concerning the Lien Law and thus the affirmance is not necessarily to be considered an adoption of the reasons stated by the lower court, at least where there are other grounds for affirmance (see *Adrico Realty Corp. v City of New York,* 250 NY 29). Thus the affirmance of *Rallo* by the Court of Appeals does not bind us on the repayment issue.

The legislative history of section 79-a of the Lien Law indicates that the repayment defense contained in subdivision 2 was intended to be an ordinary rather than an affirmative defense. In 1959 when the larceny provisions which previously had appeared in scattered sections of the Lien Law were incorporated into section 1302-c of the former Penal Law (L 1959, ch 696) on the recommendation of the Law Revision Commission (see 1959 Report of NY Law Rev Comm, pp 224-225), the defense of repayment was introduced for the first time. At the same time, the Lien Law was amended to make repayment an "affirmative defense" in a civil action (Lien Law, § 73). Section 1302-c was repealed in 1965 when the new Penal Law was adopted (see Penal Law, § 500.05) and added, without substantial change, to the Lien Law as section 79-a (L 1965, ch 1031, § 140). It is significant that when the Legislature in the 1965 revised Penal Law first created the concept of an "affirmative defense" to a criminal charge in section 25.00 (L 1965, ch 1030) it expressly labeled every defense in the revised statute either a "defense" or an "affirmative defense" (see Hechtman, Practice Commentaries, McKinneys Cons Laws of NY, Book 39, Penal Law, § 25.00, pp 62-63). Since the 1965 Penal Law revision involved repeal of the larceny provisions which had been added to the Penal Law in 1959 and their re-enactment in the Lien Law, the omission of the words "affirmative defense" takes on added significance. The term "affirmative defense" appears in the section heading of section 73 but not in section 79-a and, since the headings were

inserted by the Legislature, they limit and define the effect of the sections *(People v Molyneux,* 40 NY 113). Furthermore, the use of the term "justifiable" in subdivision 2 of section 79-a and its absence from subdivision 2 of section 73 suggest that the criminal defense was considered by the Legislature as similar to the ordinary defense of justification (Penal Law, § 35.00). Justification is a defense of general application and is not limited in its application to any specific offense.

Thus, defendants' characterization of the defense of repayment in section 79-a of the Lien Law as an ordinary one is correct. Their difficulty lies in their failure to raise it within the limitations imposed by the Legislature.

### B. THE CONSTITUTIONALITY OF THE PRESUMPTION OF WRONGFUL DIVERSION (LIEN LAW, § 79-A, SUBD 3)

The defendants argue further that the trial court relied on the presumption in subdivision 3 of section 79-a of the Lien Law in determining their guilt and that the section is unconstitutional. Our dissenting brother writes that "[e]ven assuming that these books and records did not measure up in every detail to the strict prescription of the statute", the analysis of the People's expert and analysis by the trial court belie any assertions that there was a failure to keep proper records as to give rise to the statutory presumption of guilt. This conclusion is at total variance with the record. As the trial court aptly put it: "The record also establishes, beyond a reasonable doubt, defendants' failure to keep the records required under section 75 of the Lien Law. Indeed, throughout the trial defendants themselves impugned the accuracy, adequacy and integrity of the bookkeeping procedures, and made no claim of compliance with section 75. As a result, under both sections 75(4) and 79-a(3), it is presumed that the trustee has misapplied or consented to the misapplication of trust funds. The impact of this presumption likewise remains totally unrelieved on this record."

In exquisite detail, in section 75 of the Lien Law the Legislature has set forth bookkeeping requirements relative to trust funds which are receivable, payable, received, paid, transferred or assigned. These requirements include, *inter alia,* names, addresses, dates of payment or receipt, dates sums become due or are earned or become payable, conditions of payment, nature of claims paid, whether payment is by check or cash, and numerous other relevant details. The clear

purpose of the section is to protect persons entitled to payment of funds for improvement of realty and to prevent the unscrupulous from diverting the funds to other channels (*Matter of Rafuse,* 82 NYS2d 3, affd 274 App Div 944). Although no published case has dealt with the constitutionality of the presumption in subdivision 3 of section 79-a, which provides that a trustee's failure to keep required books or records shall be presumptive evidence of wrongful diversion of trust funds, a similar provision contained in the pre-1959 law (Lien Law, § 36-d) was upheld (see, e.g., *People v Farina,* 290 NY 272). In *Farina,* the court declared *(supra,* pp 275-276): "The statutory requirement that a contractor shall keep proper books of account and shall furnish a statement in manner provided by the statute furnishes reasonable protection to those entitled to payment for improvement of property for which the contractor has been paid, and it places no unreasonable burden upon the contractor. A statutory presumption of guilt arising from unexplained and willful failure to comply with the provisions of the statute rests upon a sound foundation and does not violate any provision of the Constitution of the State of New York or of the United States."

In *People v Van Keuren* (31 AD2d 711, affd 27 NY2d 556), the conviction of a contractor who failed to keep records and failed to pay a trust fund claim within 31 days was upheld and his contention that the statute was unconstitutional because it precluded restitution as a defense was rejected. The controlling test for determining the validity of a statutory presumption is that there be a rational connection between the fact proved and the fact presumed; it must be shown that the presumed fact is more likely than not to flow from the proved facts on which it is made to depend (see *Tot v United States,* 319 US 463), or, as the New York Court of Appeals stated the test, the facts presumed must have a "natural, not an unreasonable or an unnatural, connection with facts proven" *(People v Hildebrandt,* 308 NY 397, 400) or "whether, based on life and life's experiences, a rational connection between the fact proved and the ultimate fact presumed may be said to exist." *(People v Terra,* 303 NY 332, 335.)* In many jurisdictions there exists a statutory presumption of diversion of trust funds based solely on a failure to pay laborers and materialmen and the statutes have generally been regarded as valid (see cases collected in Ann. 78 ALR3d

563). The trusteee in New York is under no such burden unless, in addition, he has failed to keep the records which would justify his actions. Since the statute so clearly requires record keeping, it would appear that there is at least a rational connection between a failure to comply and the presumed fact of diversion. Furthermore, the presumption is not an intolerable burden since it is easily rebutted *(People v Kirkpatrick,* 32 NY2d 17), and the shifting of the burden of going forward to the defendants is justified because knowledge of the facts is peculiar to the defendants (see *People v Laietta,* 30 NY2d 68).

Clear it is, then that the defendants' contention that the presumption is unconstitutional lacks merit. While it is not apparent from the instant record whether the trial court relied upon the section, we do not believe that such reliance was even necessary to sustain the larceny convictions in view of the ample evidence of the illegal nature of the expenditures made.

### C. THE SEPARATE LIABILITY ISSUE

■ The final larceny issue, the question of defendants' separate liability for the transfers, is not a difficult one. Section 79-a of the Lien Law provides for individual liability for a corporate trustee's diversion of trust funds since it applies to "[a]ny trustee of a trust arising under this article, and any officer, director or agent of such trustee". The inquiry is whether any of the defendants were actively participating in the wrong of the corporation or had knowledge of use of trust funds in the corporate business (see *Santa Barbara v Avallone & Miele,* 270 NY 1). Here the court found—and there is nothing in the record to suggest differently—that the individual defendants, acting as officers and agents of the trustees, received funds in the amount of $2,392,499.10 pursuant to a building loan contract and deposits from vendees in the amount of $550,000 and that they knew about and participated in transfers for nontrust purposes. Two of the corporation's former bookkeepers testified for the prosecution with respect to bookkeeping procedures. Their testimony was that Naples, the controller, directed their activities, including the transfer of funds, and that all checks were signed by Rosano and Newmark jointly. Since the corporate principals, Rosano and Newmark, according to the testimony of their witness, were present when the alleged agreement with the lending

institution was made and since they do not deny receipt of the alleged "repayments", their individual liability is clear. However, it is not essential that the misuse of the trust funds should be for the exclusive benefit of the person making such unlawful use (*Aetna Cas. & Sur. Co. v Lafayette Nat. Bank of Brooklyn in N. Y.,* 35 AD2d 137, affd 30 NY2d 638; *Schwadron v Freund,* 69 Misc 2d 342). Apparently, Naples signed only one check on which the conviction was based and that was a payment of $60,000 to another of their corporations which the court characterized as a nontrust disbursement. Nevertheless, the one check, together with the undisputed evidence that he directed the bookkeeping operations, was enough to sustain his conviction of misappropriation of trust funds.

The verdict on the larceny charges should be affirmed.

## II. THE REMAINING COUNTS

### A. CRIME OF MAKING APPARENTLY FALSE SWORN STATEMENTS IN THE SECOND DEGREE

The defendants were convicted on four counts of making sworn false statements. The statements consisted of four affidavits upon which four construction loan advances were made and which were signed by Naples. The affidavits contained the following declaration:

"THAT all bills due for work, labor and services rendered and materials furnished in connection with the erection on the buildings to the date of this advance are paid except the following items, which the Association is authorized and directed to pay out of this advance.

"NAME OF CONTRACTOR    AMOUNT DUE".

Although the fact that unpaid bills existed at the time the affidavits were executed is undisputed, the space provided for names and amounts was not filled in. The indictment charges that Naples "acting on behalf of himself and the other defendants herein did swear falsely in a written instrument directed to the Washington Federal Savings and Loan Association" and the court's finding with respect to all counts was that "all four defendants are criminally liable for the conduct of the corporation and of each other within the meaning of section 20.00 of the Penal Law", although it found "no reason to rule on the issue of conspiracy, which is not charged, but has been argued at length."

Section 210.35 of the Penal Law provides that a person is

guilty of making an apparently sworn false statement in the second degree when: "(a) he subscribes a written instrument knowing that it contains a statement which is in fact false and which he does not believe to be true, and (b) he intends or believes that such instrument will be uttered or delivered with a jurat affixed thereto, and (c) such instrument is uttered or delivered with a jurat affixed thereto." A person "swears falsely" when he intentionally makes a false statement which he does not believe to be true: "(a) while giving testimony, or (b) under oath in a subscribed written instrument. A false swearing in a subscribed written instrument shall not be deemed complete until the instrument is delivered by its subscriber, or by someone acting in his behalf, to another person with intent that it be uttered or published as true." (Penal Law, § 210.00, subd 5.)

█ Thus, more is required to sustain a conviction for perjury than mere falsity (see *People v Samuels,* 284 NY 410). The "culpable intent" required prior to the adoption of the revised Penal Law (see *Byrnes v Byrnes,* 102 NY 4) is still necessary, although all that must be proven is a "conscious objective" to engage in the proscribed conduct (see Marks & Paperno, Criminal Law in New York Under the Revised Penal Law, § 464). Where concealment is alleged it is necessary to show "deliberate concealment" (see *People v Lombardozzi,* 35 AD2d 528, 529, affd 30 NY2d 677). As stated in the statute, it is necessary that there have been an intent that the statement be "uttered or published as true" (see *People v Kammerer,* 240 App Div 852). In the instant case, such requisite intent was not established.

The only proof on the issue offered by the People other than the affidavits themselves was the testimony of the lending institution's mortgage officer. His testimony was that the bank "requested" an affidavit for each advance on the construction loan. However, on cross-examination, the following colloquy occurred:

"Q. Was it your belief and understanding that on October 30, 1973 every subcontractor that was working at that job had been paid dollar for dollar right up to that day?

"A. It would be our belief that after the advance they would be paid.

"Q. After the advance.

"A. Take our monies and go and pay the subcontractors.

"Q. So on the very first day at the closing when Larry Rosano signed that very first advance, you expected him to take that money and pay the subcontractors any money that were due them, isn't that right?

"A. Yes.

"Q. So you didn't rely upon that affidavit, did you, saying there was no monies due to any subcontractors?

"A. I can tell you how we relied on that affidavit.

"Q. Tell me.

"A. Just as I said before that the funds we were giving them were going to satisfy all the subs.

"Q. The existing debts?

"A. That's correct.

"Q. But certainly in your kind as of October 30, the day that closing occurred you knew that subs were owed money and this money was going to be used to pay them, isn't that right?

"A. We made a construction loan. The funds were being used to pay subcontractors. That's the intent of the loan.

"Q. For work that had been done already?

"A. Right."

And later in the cross-examination the witness testified:

"Q. The purpose of a construction loan or advance is to pay the bills to subcontractors or the bills that are due and owing, is that correct?

"A. It is to pay for construction; yes.

"Q. For work that has been done already?

"A. Yes.

"Q. And an advance, would take the money to use to pay for construction for work that has been performed?

"A. Yes."

However, on his redirect examination he testified that he had no knowledge with respect to whether there were any unpaid subcontractors, contractors, materialmen or lienors at the time the defendant Naples executed the four affidavits upon which the charges of violation of section 210.35 of the Penal Law were based.

Nevertheless, it is apparent that the lending institution was aware of the existence of unpaid contractors and materialmen when it made advances under the construction loan agreement—or at least it assumed their existence—and that the

advances were made for the precise purpose of enabling the sponsor to pay the accrued bills. Since there was no testimony that this was not the understanding of both parties to the agreement, it was not shown that the defendants "deliberately concealed" the existence of unpaid contractors or that they delivered the affidavits with the intent that they be "published as true". The affidavits were intended solely for the use of the lending institution and were neither filed elsewhere nor delivered to anyone else. Furthermore, it is not clear that under the circumstances the failure of the defendants to fill in the blanks constituted a falsity. The provision in the affidavit authorizing the lending institution to pay the contractors suggests that the contractors were to be listed only in the event that the parties agreed that the lending institution should pay the bills. But the testimony of the People's witness was that the sponsor itself was to make the payments from the funds advanced. Significantly, none of the four affidavits which were the subject of the charges contain any notation to the effect that there were no unpaid contractors.

Since it does not appear on the facts that the People have proven beyond a reasonable doubt that the defendants made apparently sworn false statements, the convictions on these counts should be reversed.

### B. THE MARTIN ACT VIOLATIONS

■ The evidence is sufficient to sustain the convictions of the corporate defendant, Rosano and Newmark of violating sections 352-c, 352-e and 359-g of the General Business Law insofar as the offering statement falsely represented that the defendants would hold in trust moneys received from purchasers of condominium homes (count 222) and insofar as the offering statement omitted the material fact that sewer approval had been revoked (count 223). However, the trial court found Naples *not* guilty with respect to count 223 upon the ground that "[t]he record is bare of evidence connecting defendant Naples to the preparation, filing or amendment of the offering statement" but it did not except him from liability with respect to count 222. Since both counts involve statements in the same offering statement, the conviction on count 222 should be reversed with respect to Naples.

The verdict with respect to violation of sections 352-h and 359-g of the General Business Law in that defendants misap-

propriated moneys received from purchasers of condominium units is supported by the evidence.

The judgment should be modified to the extent that (1) the false swearing convictions against all the defendants should be reversed and counts 213, 214, 215 and 216 of the indictment dismissed as against them; and (2) the conviction of defendant Naples on count 222 of the indictment should be reversed and that count dismissed as to him. The proceeding should be remanded to the trial court for further proceedings in accordance herewith.

Suozzi, J. P. (concurring in part and dissenting in part). I dissent from so much of the majority's determination as affirms the defendants' judgment of conviction on 15 counts of larceny in violation of section 79-a of the Lien Law for misappropriation of $777,851 of building loan trust funds and of $245,408.76 of vendees' deposits, for a total $1,023,259.76, during the period October 31, 1973 to December 13, 1973 and of violating sections 352-h and 359-g of the General Business Law for misappropriating vendees' contract advances.

In my opinion, these convictions must be reversed and a new trial granted because of errors which permeated the trial and resulted in prejudice to the defendants that can only be remedied by a new trial.

A reading of the trial court's decision rendered after a nonjury trial discloses that in reaching its verdict on the charges involved in these convictions, the court erroneously (1) invoked and relied upon the presumption created by subdivision 3 of section 79-a of the Lien Law from the failure to keep proper books and records, (2) deemed the repayment defense as an affirmative one to be proved by the defendants by a fair preponderance of the evidence, and (3) refused to consider reimbursement or payment of preloan expenditures not itemized in the loan agreements in connection with this defense.

### THE PRESUMPTION CREATED BY SUBDIVISION 3 OF SECTION 79-A OF THE LIEN LAW

This section provides as follows: "3. Failure of the trustee to keep the books or records required by section seventy-five shall be presumptive evidence that the trustee has applied or consented to the application of trust funds received by him as money or an instrument for the payment of money for pur-

poses other than a purpose of the trust as stated in section seventy-one."

Both the record and the Trial Judge's decision establish that the defendants' records and books played a crucial role in establishing the People's case and in the court's finding the defendants guilty of the larceny charges.

The following extractions from the trial court's decision establish this beyond any peradventure of doubt:

"On their direct case, the People introduced, *inter alia,* VM's books of account containing the daily entries of cash receipts and disbursements. These records listed all checks drawn on VM's checking account and included notations designating the purposes for which the checks were issued, but not the source of the funds. In addition, the People introduced VM's accounts payable ledgers (N.C.R. sheets), the bank statements and cancelled checks. Also introduced were the offering plan for the sale of apartment homes in Village Mall Town Houses Condominium, the building loan agreement made with WFSLA, the building loan mortgage and affidavits submitted by VM to WFSLA. Each affidavit recites that it was executed to induce WFSLA to make the advances under the construction loan agreement. In evidence, also, are the mortgage note and checks issued as building loan advances. * * *

"In arriving at its verdict * * * the court itself analyzed the books containing the daily accounts of cash receipts, the disbursements, and the purposes for which each check was issued. In analyzing the books, the court determined the amount of trust funds and non-trust funds available on a daily basis. The court also determined whether the source of the trust funds was the purchasers' escrow deposits or moneys from the building loan agreement, or both."

These acknowledgments of the People's and the trial court's reliance on the defendants' records and books to prove and find guilt, respectively, are inconsistent with the assertion that the defendants failed to keep proper records and books and that this failure was presumptive evidence of larcenous misappropriation of trust funds by the defendants.

Even assuming that these books and records did not measure up in every detail to the strict prescription of the statute, the analysis of these records by the People's expert which was relied on to establish the People's case, and the independent analysis of these same records by the trial court to reach its verdict, belie any assertion or claim that there was such a

failure to keep proper records as to give rise to the statutory presumption of guilt. Under these circumstances, the defendants' compliance in keeping records and books as to the source of the trust funds and their application was necessarily sufficient to render the presumption a legally unsound basis for these convictions. Neither does the defendants' obviously unsuccessful impugning, as the trial court found, of the accuracy, adequacy and integrity of the bookkeeping procedure provide a sound predicate for invoking this statutory presumption.

The majority avoids the issue of the presumption's application to the facts presented here by questioning the necessity of this presumption and the court's reliance on it to sustain the convictions. Needless to say, I do not share my colleagues' doubts. The trial court's discussion of this issue in its extensive decision was pointless if it did not deem it necessary to find guilt and did not in fact rely upon it to sustain the convictions.

The admonition in *People v Van Keuren* (31 AD2d 711, 712, affd 27 NY2d 556), that the Lien Law "has been and should be sparingly used for penal purposes" makes it that much more imperative that the trial of this rare criminal prosecution under this statute for misappropriation of trust funds should have been free of this erroneously invoked presumption to insure a proper trial.

On this ground alone, a reversal is required and a new trial should be held at which the prejudicial impact of this statutory presumption is avoided.

THE REPAYMENT DEFENSE (PURSUANT TO LIEN LAW, § 79-A, SUBD 2)

This provision reads:

"2. Notwithstanding subdivision one of this section, if the application of trust funds for a purpose other than the trust purposes of the trust is a repayment to another person of advances made by such other person to the trustee or on his behalf as trustee and the advances so repaid were actually applied for the purposes of the trust as stated in section seventy-one, or if the trustee has made advances of his personal funds for trust purposes and the amount of trust funds applied for a purpose other than the trust purposes of the trust does not exceed the amount of advances of personal

funds of the trustee actually applied for the purposes of the trust, such application or consent thereto shall be deemed justifiable and the trustee, or officer, director or agent of the trustee, shall not be deemed guilty of larceny by reason of such application or by reason of his consent thereto."

In finding that this repayment defense "had not been met" the decision of the trial court makes it abundantly clear that in reliance on *People v Rallo* (46 AD2d 518, affd 39 NY2d 217), the repayment defense herein provided was construed as an affirmative defense with the burden of proof on the defendants to establish the defense by a preponderance of the evidence (Penal Law, § 25.00).

A reading of the trial court's decision discloses that this finding was also premised on the undisputed fact that none of the preloan expenditures which the defendants asserted as the basis of their defense were itemized in any of the loan documents. From this the trial court reasoned that the expenditures did not qualify as "costs of improvements" as defined by subdivision 5 of section 2 of the Lien Law.

Unlike the trial court, the majority construes the repayment defense as an ordinary one which the People must disprove beyond a reasonable doubt. Nevertheless, the majority adopts the trial court's rationale as to the repayment defense and holds that it had not been established.

Accepting the majority's view of this repayment defense as an ordinary one, I cannot agree with my colleagues' application of it to the facts presented.

The People's expert conceded that prior to the creation of the trust funds from the loan advances and the vendees' deposits, the preloan expenditures relating to the construction of the project totaled $1,186,688, an amount which exceeds the misappropriations for which the defendants were convicted.

The former mortgage officer of the bank which made the loan advances to the defendants and who was presented as a People's witness, admitted that at the time of the first advance the project was approximately 20% completed. Although this same witness denied that it was understood and contemplated that the defendants could apply part of the first advance towards one half of the land value, to wit, $850,000 (half of the ultimate land value of $1,700,000), he did acknowledge that the loan advances could be used to pay subcontractors for work they had done previously and that $800,000 to

$900,000 was for soft cost items of construction (appraisal, mortgage and brokerage fees, taxes, etc.).

Both the trial court's decision and the majority's opinion completely disregard the testimony on the premise that the reimbursement or payment of a preloan expenditure not recited in any loan agreement is not a proper basis for asserting the repayment defense.

As a result of this posture taken at the trial, no findings were made by the Trial Judge in this regard and none can now be made as to which, if any, of the misappropriations were actual reimbursement or payment of preloan expenditures.

I respectfully submit that the posture taken at trial with respect to the nature of the repayment defense and the burden of proof and as to preloan expenditures (other than land acquisition costs) not referred to in the loan documents resulted in prejudicial error to the defendants which requires a reversal and a new trial.

By limiting preloan expenditures which are itemized in the loan documents as the sole basis for establishing this statutory repayment defense, the trial court and the majority have rendered this provision totally superfluous and meaningless, and have effectively obliterated this defense in criminal prosecutions. By this interpretation, the legislative intent and purpose of this defense are completely frustrated.

If, as the Trial Judge and the majority postulate, only preloan expenditures itemized in the loan documents qualify for reimbursement advances and payment of preloan obligations (other than for land acquisition costs), there could never be a factual situation in which this defense could be asserted in a criminal prosecution under the Lien Law. If these expenditures were itemized there would be no basis for a civil suit, much less a criminal prosecution.

In order to give this repayment defense any scope or purpose, the provision must be construed as providing a defense to absolve one of criminal liability for repayment of nonitemized preloan expenditures (other than loan acquisition costs).

There is nothing in the legislative history to indicate to the contrary. Section 79-a of the Lien Law is derived from section 1302-c of the former Penal Law which was enacted in 1959, repealed in 1965 and added the same year to the Lien Law, without substantial change, as section 79-a.

Although section 1302-c of the former Penal Law incorpo-

rated several scattered provisions of the Lien Law, subdivision 2 thereof, which contained the repayment defense, was a new provision and according to its legislative history, it gave the trustee "a defense to a larceny charge where the application of trust funds for a non-trust purpose is a repayment of advances actually applied for a trust purpose and where the trustee has made advances from his personal funds and the amount of trust funds applied for a non-trust purpose does not exceed the amount of advances of personal funds actually applied for the purposes of the trust." (1959 Report of NY Law Rev Comm, p 225.)

There is absolutely no indication in this legislative history to indicate or suggest that preloan expenditures had to be listed in the building loan documents in order for the trustee to invoke the repayment defense. Just as this defense was applicable to preloan expenditures not itemized in the loan documents (there being no limiting language in section 1302-c of the former Penal Law), it is similarly applicable now to preloan expenditures not referred to in any of the loan documents.

Accordingly, the resolution of the question of defendants' criminal responsibility must await a new trial free of error as to the nature of the defense and the burden of proof at which time consideration should be given to preloan expenditures not itemized in any of the loan documents.

If there is any fault to be found in the results flowing from such an interpretation, one must look to the Legislature to eliminate this defense and not require that it be ignored or emasculated by circuitous or nugatory construction.

RABIN and COHALAN, JJ., concur with LAZER, J.; SUOZZI, J. P., concurs in part and dissents in part, with an opinion.

Four judgments of the Supreme Court, Queens County, all rendered May 23, 1978, modified, on the law, by (1) reversing the convictions of all defendants under counts 213, 214, 215 and 216, and the sentences imposed thereon, and the said counts are dismissed and (2) reversing the conviction of defendant Naples under count 222, and the sentence imposed thereon, and said count dismissed as to Naples. As so modified, judgments affirmed, and case remitted to the Supreme Court, Queens County, for further proceedings pursuant to CPL 460.50 (subd 5).