OPINION OF THE COURT
Hancock, Jr., J.
On defendants’ appeal in an enforcement action brought by the Attorney-General under the antifraud provisions of the *721 Martin Act we must decide whether the failure to mention an unsatisfied precondition to a cooperative conversion of an apartment house constituted fraud which justified the issuance of an injunction under General Business Law § 353 and Executive Law § 63 (12). Because the omitted information had previously been furnished in the original offering plan and, in any event, would not have been a significant factor in the purchase decision of a reasonable tenant, we conclude that the omission did not constitute actionable fraud.[1] The order of the Appellate Division should, therefore, be reversed, the injunction vacated, and the complaint dismissed.
I
The Attorney-General commenced this action for an injunction pursuant to General Business Law § 353 and Executive Law § 63 (12) based on allegedly fraudulent acts committed during the eviction-type cooperative conversion of Gramercy Park Towers, a 328-unit apartment at 205 Third Avenue, New York City.[2] The defendants are the selling agent, Rachmani Corporation, and its president, Jay Rachmani.[3] The action arises from the July 3, 1980 notice delivered by defendants to the tenants two days before the deadline for the exercise of their rights to purchase their apartments at the "insider price”. The claim of fraud concerns information pertaining to the terms and conditions of the offering plan for the cooperative conversion, specifically two conditions for the effectuation of the plan: the requirement that for the plan to be effective as an eviction-type conversion, 35% of the eligible tenants *722 must have subscribed prior to July 6, 1980; and an unrelated requirement, imposed by the mortgagee, that 40.5% of the apartments be sold prior to June 26, 1981.
Defendants, in the July 3, 1980 notice, advised the tenants, as they were required to do by statute, that the 35% precondition had been met. There was no mention in this notice of the then unmet 40.5% condition, however, and it is the omission of this allegedly material information on which the Attorney-General’s claim of fraud is based. To explain the Attorney-General’s action, we first summarize the relevant details of the plan and the critical events leading up to July 6, 1980, the cutoff date for the rights of tenants to purchase at the insider price.
The terms and conditions of the proposed conversion had been described in an offering plan (see, General Business Law §§ 352-e, 352-eeee) which was accepted for filing by the Attorney-General and distributed to the tenants on December 26, 1979. Thereafter, as a result of protracted negotiations with the sponsors, the tenants — who had formed a tenants’ association and hired counsel — succeeded in obtaining certain favorable revisions in the plan including a reduction in the price per share offered to tenants. These revisions were the subject of four amendments to the plan, the last one of which was filed on May 30, 1980.
The plan, as amended, contained the following pertinent provisions:
(1) The condition that 35% of the tenants subscribe. The plan provided — as mandated by section YY51-6.0 (c) (9) (a) of the Administrative Code of the City of New York and section 61 (4) of the Code of the Rent Stabilization Association of New York City, Inc. (Rent Stabilization Code) — that it could be effected as an eviction-type conversion only if 35% of the nonexempt tenants (occupying 93 of the apartments) subscribed to purchase agreements prior to June 26, 1981. In an amendment to the plan, the sponsors agreed to change the proposed conversion to the noneviction type if this 35% requirement was not met by July 6, 1980; if the 35% was achieved prior to June 26, 1981, the conversion would still be effective, but the nonpurchasing tenants could not be evicted. The 35% condition was satisfied prior to the July 6, 1980 deadline, and the tenants were so advised in the July 3 notice.
(2) The insider price option. Until July 6, 1980, the tenants could purchase shares at the insider price. After July 6, 1980 *723 —assuming that the conversion was ultimately sanctioned as an eviction plan — the tenants would have to buy at the higher outsider price or face eviction at the end of their leases.
(3) The condition that 40.5% of the apartments be sold. The plan also required that 40.5% of the apartments be sold on or before June 26, 1981. This condition — which is at the root of the Attorney-General’s complaint — was separate from and unrelated to the 35% precondition. The 40.5% requirement was not mandated by statute and had nothing to do with the protection of the tenants or with the plan’s approval as an eviction-type rather than a noneviction-type conversion. It was imposed by the mortgagee, solely for its protection, as a condition for its consent to any cooperative conversion of the building. The mortgagee could modify or waive the requirement entirely and the 132 apartments (40.5%) could be sold to tenants and nontenants alike.
(4) Return of tenants’ moneys if plan abandoned. If the plan was not declared effective within the time limits set forth, it would be deemed abandoned and "all monies would be returned to the purchasers, in full, with interest, if any”.
By July 1, 1980, only five days prior to the deadline for insider purchases and satisfaction of the 35% requirement, fewer than 10 tenants had signed up as subscribers. At a meeting that night, the negotiating committee announced to the tenants’ association that it had attained the best deal available and that each tenant should do as he or she saw fit. By the night of July 3, 96 valid subscriptions from tenants had been secured, and the sponsors had thus exceeded the 35% requirement (93 subscriptions) for an eviction plan.
Immediately thereafter, defendants, as mandated by Rent Stabilization Code § 61 (8),[4] delivered the following letter to each tenant:
"July 3, 1980
"Dear Tenant:
"On behalf of the Sponsor, 19th Street Associates, and the Apartment Corporation, 205 Third Avenue Owners’, Inc., please be advised that this letter is formal notice to you, as *724 per the requirement of paragraph 8 of Section 61 of Rent Stabilization Code, that 35% of tenants in occupancy at the time of presentation of the Plan, have subscribed to purchase shares allocated to their apartmnets [sic].
"An Amendment to the Plan will be filed shortly, disclosing the names of all purchasers, the apartments sold and the purchase price of each apartment.”
No reference was made to the 40.5% requirement imposed by the mortgagee. Nor was any mention of this requirement made in other communications to the tenants, including the various amendments to the original plan and a letter to all tenants dated June 30, 1980 reminding them that the period during which they could purchase at the insider price expired on July 6, 1980.[5]
In his complaint, the Attorney-General alleges that defendants defrauded the tenants by stating falsely in the July 3 letter that the requisite 35% of the tenants had agreed to purchase apartments. The trial court found, however, that more than 35% of the tenants had, in fact, signed valid subscriptions on July 3 and that, therefore, the notice did not contain any false statement. The Attorney-General was permitted to amend his complaint to conform to the proof and to include the contention that the July 3 notice omitted material information, i.e., that the plan also contained the 40.5% condition imposed by the mortgagee and that this level of subscriptions had not been reached as of July 3, 1980. Based on this omission alone, the trial court found that defendants had committed fraud under the Martin Act, stating: "By failing to call attention to the 40.5% requirement in the interim communications and particularly in the July 3, letter, the defendants the Rachmani Corporation and Jay Rachmani violated the fraud and good faith requirements of the Martin Act. Many tenants reasonably assumed, on reading the July 3 letter, that all of the conditions precedent to declaration of effectiveness of the eviction plan had been attained and were thereby induced to subscribe to the cooperative conversion plan.”
*725 The court imposed an injunction on defendants pursuant to General Business Law § 353 (2) and, upon its further finding that defendants’ conduct constituted persistent fraud, it based its injunction on Executive Law § 63 (12), as well. The Appellate Division (one Justice dissenting) affirmed for the reasons set forth in the trial court’s decision, and the appeal is before us by leave of that court. We now reverse.
II
The Attorney-General’s claim of fraudulent practices under the Martin Act is not based on any intentionally misleading conduct, misrepresentation, or misstatement by defendants.[6] Nor is it claimed that any statement was untrue. Indeed, the Attorney-General does not now dispute the trial court’s findings that more than 93 of the nonexempt tenants had then signed purchase agreements on July 3 and that, therefore, the statement in the letter that the 35% condition had been satisfied was true.
Instead, the Attorney-General’s claim is founded entirely on defendants’ failure to make reference to the fact that, although on July 3, 1980 the 35% requirement had been met, the sponsor still had to sell 132 apartments (40.5%) prior to June 26, 1981 to secure the mortgagee’s consent. As previously noted, unlike the notification in the July 3 letter concerning the 35% precondition which was called for by Rent Stabilization Code § 61 (8), there was no statutory requirement that the tenants be given any information with respect to the sponsors’ progress in meeting the 40.5% precondition. Nevertheless, the Attorney-General points out that in the early hours of July 4, 1980 when the July 3 notice was circulated, only 96 apartments had been sold. He argues that defendants’ failure to refer to the 132-apartment (40.5%) requirement and the fact that it had not yet been met constituted the omission of material information needed for the tenants to make their judgment (General Business Law § 352-e [1] [b]) and, as such, a fraudulent practice under General Business Law § 352-c (1) (a).
*726 The lower courts held that, given the liberal construction to be accorded the Martin Act, an omission as well as a concealment or suppression of information may be actionable as a fraudulent practice (see, General Business Law § 352-c [1] [a]; People v Federated Radio Corp., 244 NY 33, 38-39). This is not disputed (see, People v Rosano, 69 AD2d 643, 661, affd 50 NY2d 1013; cf., TSC Indus. v Northway, Inc., 426 US 438, 444). We turn then to the question of what would constitute a material omission which would be actionable under the Martin Act. Because there is nothing in the statute or case law specifically addressing materiality of an omission under the Martin Act, we find it appropriate to consider the decisions of the United States Supreme Court and other Federal courts construing the Federal securities laws. To be sure, the provisions of the State and Federal statutes are not identical. But the remedial purposes of the statutes are the same (see, Matter of Gardner v Lefkowitz, 97 Misc 2d 806, 812), and General Business Law § 352-e (1) (a), we note, makes specific reference to the Federal Securities Act of 1933 (see, All Seasons Resorts v Abrams, 68 NY2d 81, 87). Accordingly, we turn to the Federal authorities.
The now accepted standard for materiality of an omission in cases involving the Federal securities statutes was articulated by the Supreme Court in TSC Indus. v North way, Inc. (426 US 438, supra) and recently reaffirmed in Basic Inc. v Levinson (485 US —, 99 L Ed 2d 194). It is this: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote * * * It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix’ of information made available.” (426 US, at 449, supra [emphasis added].) (See also, Data Probe Acquisition Corp. v Datatab, Inc., 722 F2d 1, 5-6 [2d Cir], cert denied 465 US 1052 ["The disclosure required by the Act is not a rite of confession or exercise in common law pleading. What is required is the disclosure of material objective factual matters”]; Spielman v General Host Corp., 402 F Supp 190 [SD *727 NY], affd 538 F2d 39 [2d Cir].) In assessing the importance of an omission in its effect on the deliberations and the decision of the offeree and whether the omitted fact would have significantly altered the "total mix” of information available, Federal courts have held that a reasonable investor is presumed to have knowledge of information that has already been disclosed or is readily available (see, Colonial Lincoln-Mercury v Musgrave, 749 F2d 1092, 1099 [4th Cir]; Frigitemp Corp. v Financial Dynamics Fund, 524 F2d 275, 282 [2d Cir]).
We believe that the objective test for materiality of an omission as articulated by the Federal courts construing Federal securities laws is equally appropriate in determining liability in this action and, accordingly, we adopt it for that purpose (cf., All Seasons Resorts v Abrams, supra, at 88).
Ill
We come then to an application of the objective test in the circumstances here, taking into account that the "total mix” of information already in the hands of tenants on July 4, 1980, would have included disclosure of the mortgagee’s 40.5% requirement as set forth in the original offering plan. We conclude, as a matter of law, that an addition to the July 3 notice reminding tenants of that requirement and advising them that it had not yet been met would not "have assumed actual significance in the deliberations of [a] reasonable [tenant]” (TSC Indus. v Northway, Inc., supra, at 449). The immediate question facing tenants on July 4 and 5 was what to do before their rights to buy at the reduced insider price expired on July 6. The July 3 notice advised them — truthfully—that the required 35% of the tenants had subscribed. They would then have realized that the plan, if it was to became effective at all, would be one where tenants could be evicted if they did not purchase.
The original offering plan had been distributed on December 26, 1979 and a reasonable tenant would be presumed to have had knowledge of its contents (see, Data Probe Acquisition Corp. v Datatab, Inc., supra; Spielman v General Host Corp., 538 F2d, supra, at 41). Thus, the tenant was bound to know not only about the existence of the mortgagee’s requirement that 132 (40.5%) of apartments be sold, but also that the sponsors had almost a full year to achieve that number of apartment sales, that they could do so by selling apartments not only to tenants but to outsiders, as well, and that a *728 purchasing tenant’s money would be returned if the conversion did not take place. Under these circumstances, for a reasonable tenant who desired to remain in the building and could finance the purchase of his apartment, the fact that the sponsors on July 3 had not yet succeeded in satisfying the 40.5% precondition would have had little or no bearing on the question of whether to purchase at the insider price.
Moreover, while defendants, in carrying out the cooperative conversion, were obliged, in their communications to tenants, to advise them of all material facts, "there is no requirement that information already adequately disclosed be spoonfed to them” (Spielman v General Host Corp., 402 F Supp 190, 206 [SD NY, Weinfeld, J.], affd 538 F2d 39 [2d Cir], supra). Indeed, some courts have noted that including what is unnecessary and extraneous as well as omitting what is material may result in misleading the offeree (see, Data Probe Acquisition Corp. v Datatab, Inc., supra, at 5; Spielman v General Host Corp., 402 F Supp, supra, at 203). Here, as defendants point out, it is possible that a gratuitous "reminder” about the then unmet 40.5% condition in the July 3 notice could have been regarded as an effort by defendants — who presumably knew that the eviction-type conversion would eventually be authorized — to mislead the tenants and to induce them not to exercise their "insider rights” by July 6 so that the sponsors could thereafter exact from them the higher outsiders’ price.
Accordingly, the order should be reversed, with costs, the injunction vacated and the complaint dismissed.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Titone and Bellacosa concur.
Order reversed, etc.

. Because we hold that fraud has not been established — either as defined in the Martin Act (General Business Law § 352-c [1] [a]) or under the virtually identical language in Executive Law § 63 (12) (see, n 5, infra) — we need not address the further requirement for an injunction under Executive Law § 63 (12): that the fraud be persistent.

. The conversion proceeded under the then applicable provisions requiring that for an eviction plan to be declared effective, 35% of the tenants in occupancy had to agree to purchase their apartments within 18 months from the date of presentation of the plan to the tenants (see, General Business Law § 352-eeee; Administrative Code of City of New York § YY516.0 [c] [9] [a]; Code of Rent Stabilization Association of New York City, Inc. § 61). The statutes have since been amended to require that 51% of the tenants in occupancy subscribe within 15 months for an eviction plan to be effective (see, General Business Law § 352-eeee [1] [c]; [2] [a], [d]).

. The sponsors of the project, "19th Street Associates”, are not parties. The action has been dismissed against another defendant, an employee of the agent, Dallas Peltz. There is no cross appeal from this dismissal by the Attorney-General.

. Section 61 (8) of the code, as it was in July 1980, provided: "When the 35 percent requirement, provided in 4 (a) above, has been met the owner will promptly notify all occupants and shall file a copy of the notice with the Department of Housing Preservation and Development along with an affidavit indicating the total number of apartments involved in computing the 35 percent and the names and apartments of the purchasing tenants.”

. The 40.5% requirement, however, was the subject of a letter addressed to the Attorney-General dated January 8, 1980 from Errol A. Brett, Esq., attorney for the tenants’ committee. Mr. Brett, in the letter, requested that the Attorney-General direct a sponsor to state whether the mortgagee bank will modify or waive the 40.5% precondition. A copy of this letter was distributed to every tenant in the building.

. We agree with the holding of the lower courts that to establish liability for fraudulent practices in an enforcement proceeding under the Martin Act, the Attorney-General need not allege or prove either scienter or intentional fraud (see, People v Lexington Sixty-First Assocs., 38 NY2d 588, 595; People v Federated Radio Corp., 244 NY 33, 38-39; Mihaly & Kaufmann, Practice Commentary, McKinney’s Cons Laws of NY, Book, 19, General Business Law art 23-A, at 17-19).