People v Credit Suisse Sec. (USA) LLC (2018 NY Slip Op 04272)

People v Credit Suisse Sec. (USA) LLC

2018 NY Slip Op 04272 [31 NY3d 622]

June 12, 2018

DiFiore, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, October 3, 2018

[*1]

The People of the State of New York, by Eric T. Schneiderman, Attorney General of the State of New York, Respondent,
v
Credit Suisse Securities (USA) LLC, Formerly Known as Credit Suisse First Boston LLC, et al., Appellants.

Argued March 21, 2018; decided June 12, 2018

People v Credit Suisse Sec. (USA) LLC, 145 AD3d 533, modified.

{**31 NY3d at 626} OPINION OF THE COURT

Chief Judge DiFiore.

In this action brought by the Attorney General, the primary issue is whether Martin Act (General Business Law art 23-A, § 352 et seq.) claims are governed by the three-year statute of limitations in CPLR 214 (2) or the six-year limitations period in either CPLR 213 (1) or (8). Because the Martin Act expands liability for "fraudulent practices" beyond that recognized under the common law, we conclude that CPLR 214 (2)—covering "action[s] to recover upon a liability, penalty or forfeiture created or imposed by statute"—controls. With respect to the Attorney General's Executive Law § 63 (12) claim, we remit to Supreme Court for further proceedings.
I.
[*2]
After an investigation,[FN1] the Attorney General commenced this action in November 2012 asserting that the issuance of residential mortgage-backed securities by defendants Credit Suisse Securities (USA) LLC and affiliated entities (Credit Suisse) in 2006 and 2007 violated the Martin Act. The complaint{**31 NY3d at 627} alleges that defendants committed multiple fraudulent and deceptive acts in connection with the creation and sale of residential mortgage-backed securities (RMBS). In particular, the Attorney General claimed that defendants led investors to believe that they had "carefully evaluated—and would continue to monitor" the quality of loans underlying the RMBS. However, the complaint asserts that defendants were aware of "pervasive flaws in the screening process" for such loans but failed to disclose them to investors. Further, defendants purportedly encouraged originators to deliver defective loans based on an "incentives" program. Thus, the Attorney General contended defendants misrepresented the quality of the mortgage loans underlying the securities as well as the due diligence process. After describing the alleged misconduct in some detail, the first cause of action states that defendants' acts and practices violated article 23-A of the General Business Law (the Martin Act). In a second cause of action incorporating by reference the same allegations, the complaint alleges defendants "engaged in repeated fraudulent or illegal acts (in violation of, inter alia, the Martin Act)," contrary to Executive Law § 63 (12).
Defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (5) and (7) arguing, among other things, that the action was time-barred because the operative statute of limitations is the three-year period found in CPLR 214 (2). The Attorney General countered, as relevant here, that the action was timely because Martin Act and Executive Law § 63 (12) claims are governed by the six-year limitations period found in CPLR 213 (1) or (8). Alternatively, the Attorney General asserted that a six-year limitations period was applicable here because the complaint pleaded the elements of common-law fraud.
Supreme Court denied the motion to dismiss in its entirety, concluding "that Executive Law § 63 (12) and Martin Act cases based on investor fraud were governed by the six year statute of limitations of CPLR 213" (46 Misc 3d 1211[A], 2014 NY Slip Op 51912[U], *5 [Sup Ct, NY County 2014]). The court reasoned "that the essence of plaintiff's claims under both Executive Law § 63 (12) and the Martin Act is that defendants made false representations in order to induce investors to purchase their securities . . . [and] thus seek to impose liability on defendants based on the classic, longstanding common-law tort of investor fraud" (2014 NY Slip Op 51912[U], *6).
{**31 NY3d at 628}The Appellate Division affirmed, insofar as appealed from, with two Justices dissenting. The Appellate Division adhered to its prior holding in State of New York v Bronxville Glen I Assoc. (181 AD2d 516 [1st Dept 1992]) applying a six-year statute of limitations to Martin Act claims, noting that the language in Executive Law § 63 (12) parallels that of the Martin Act, and concluding that "both the Martin Act and section 63 (12) target wrongs that existed before the statutes' enactment, as opposed to targeting wrongs that were not legally cognizable before enactment" (145 AD3d 533, 535 [1st Dept 2016]). The Court further concluded that "the complaint sets forth the elements of common-law fraud, including scienter or intent, reliance, and damages" because the allegations "describe a specific scheme whereby Credit Suisse benefited itself at the expense of investors" (id. at 536 [internal quotation marks and brackets omitted]). The dissent would have reversed and granted defendants' motion to dismiss the Martin Act and Executive Law § 63 (12) claims as time-barred, concluding the three-year statute of limitations in CPLR 214 (2) applied (145 AD3d at 539-540 [Andrias, J., dissenting]). The dissent largely relied on our decision in Gaidon v Guardian Life Ins. Co. of Am. (96 NY2d 201, 208 [2001] [Gaidon II]), which reasoned that CPLR 214 (2) applies to claims under General Business Law § 349 because that statute both lacks a scienter requirement and encompasses a wider range of deceptive business practices than were condemned at common law. The dissent reasoned that the same was true with respect to the claims pressed by the Attorney General here, warranting the same result. The Appellate Division granted defendants leave to appeal, certifying the question whether its order was properly made.
[*3]II.
The first issue before us is whether Martin Act claims are governed by CPLR 214 (2), imposing a three-year statute of limitations, or the six-year limitations period in CPLR 213 (1) or (8).[FN2] CPLR 214 (2) generally imposes a three-year limitation period for "an action to recover upon a liability, penalty or forfeiture created or imposed by statute." "[A]n action based upon fraud" receives a six-year statute of limitations pursuant to CPLR 213 (8). CPLR 213 (1) is a residuary provision applicable{**31 NY3d at 629} to "an action for which no limitation is specifically prescribed by law."
The test for determining the applicability of CPLR 214 (2) is well-settled. As explained in Gaidon II:
"CPLR 214 (2) does not automatically apply to all causes of action in which a statutory remedy is sought, but only where liability 'would not exist but for a statute' (Aetna Life & Cas. Co. v Nelson, 67 NY2d 169, 174). Thus, CPLR 214 (2) 'does not apply to liabilities existing at common law which have been recognized or implemented by statute' (id.). When this is the case, the Statute of Limitations for the statutory claim is that for the common-law cause of action which the statute codified or implemented" (96 NY2d 201, 208 [internal quotation marks and citation omitted]).
When interpreting CPLR 214 (2), we have contrasted "(1) claims which, although provided for in a statute, merely codify or implement an existing common-law liability . . . with (2) claims which, although akin to common-law causes, would not exist but for the statute . . . in which case CPLR 214 (2) applies" (id. at 209, quoting Matter of Motor Veh. Acc. Indem. Corp. v Aetna Cas. & Sur. Co., 89 NY2d 214, 220-221 [1996]). For example, we recently held that CPLR 214 (2) applies to disputes against a self-insurer with respect to the payment of no-fault benefits, noting that the obligation to make such payments would not exist but for the No-Fault Law itself (see Contact Chiropractic, P.C. v New York City Tr. Auth., 31 NY3d 187 [May 1, 2018]; see also Aetna Life & Cas. Co., 67 NY2d 169 [applying CPLR 214 (2) to insurer action to recoup first-party no-fault benefits paid to its insured pursuant to a statutory lien against settlement proceeds]).
The Martin Act, codified at General Business Law article 23-A, "authorizes the Attorney General to investigate and enjoin fraudulent practices in the marketing of stocks, bonds and other securities within or from New York State (see General Business Law §§ 352, 353)" (Kerusa Co. LLC v W10Z/515 Real Estate Ltd. Partnership, 12 NY3d 236, 243 [2009]). Expansive definitions of the "fraudulent practices" covered by the article appear in General Business Law §§ 352 and 352-c but prohibitions against fraud, misrepresentation and material omission are found throughout the statutory scheme (see e.g. General Business Law § 352-e [1] [b] [mandatory offering statements {**31 NY3d at 630}filed with respect to real estate syndication offerings "shall not omit any material fact or contain any untrue statement of a material fact"]). Section 353 grants the Attorney General broad authority to investigate, to secure a permanent injunction against any person or entity that has engaged in fraudulent practices and to obtain restitution of money or property wrongfully obtained. Despite the scope and detail of the statutory scheme, there is no provision stating the applicable statute of limitations and, although the Martin Act is nearly a century old, we have never had occasion to consider the issue.
To determine whether the Martin Act creates liabilities that did not exist at common law within the meaning of CPLR 214 (2), we start with the statutory scheme—which has evolved significantly over time. The initial version of the Martin Act was adopted in 1921. Five years later, we decided People v Federated Radio Corp. (244 NY 33, 38-39 [1926]), concluding the terms fraud and fraudulent practices—which were not yet defined—"should . . . be given a wide meaning so as to include all acts, although not originating in any actual evil design or contrivance to perpetrate fraud or injury upon others, which do by their tendency to deceive or mislead the purchasing public come within the purpose of the law." After noting that the Penal Law prohibited certain fraudulent practices involving the flotation of worthless securities, we stated:
[*4]
"If the intent of the defendants in engaging in the practices complained of is to sell securities which are in fact worthless or worth substantially less than the asking price, intentional misstatements, as in an action at law to recover damages for fraud and deceit . . . need not be alleged. Material misrepresentations intended to influence the bargain, on which an action might be maintained in equity to rescind a consummated transaction, are enough" (id. at 40-41 [citations omitted]).
The Attorney General significantly relies on Federated Radio in asserting that the Martin Act merely codified liabilities existing at common law.
Of course, there have been many material alterations to the Martin Act since 1926, all of which "broaden its reach" (Assured Guar. [UK] Ltd. v J.P. Morgan Inv. Mgt. Inc., 18 NY3d 341, 350 [2011]). The statute was amended to incorporate concepts found in the federal Blue Sky statutes (see Securities and Exchange Acts of 1933 and 1934), which imposed registration requirements on sellers of securities—requirements unknown{**31 NY3d at 631} to the common law (see L 1935, ch 271). In 1955, the Martin Act was amended to define "fraudulent practices" to include "any deception, misrepresentation, concealment, suppression, fraud, false pretense or false promise" (General Business Law § 352, as amended L 1955, ch 553). At the same time, a new section 352-c was added permitting the Attorney General to seek criminal sanctions for conduct violating the Martin Act (id.). Section 352-c, while echoing the new "fraudulent practices" language, also clarified that the act prohibits "[a]ny promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances" as well as "[a]ny representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made" (General Business Law § 352-c [1] [b], [c]).
The definition of fraudulent practices was expanded again in 1959 when the legislature added General Business Law § 359-e imposing new registration requirements on dealers and brokers (see L 1959, ch 692). Section 359-e (14) (l) provides: "A violation of this subdivision shall constitute a fraudulent practice as that term is used in this article" and a specific reference to section 359-e was added to section 352. In 1960, the law was amended to add section 352-e creating registration and disclosure requirements specifically relating to the sale of security interests in cooperative apartments and condominiums (L 1960, ch 987)—a provision that has spawned civil enforcement actions by the Attorney General under section 353 (see e.g. State of New York v Rachmani Corp., 71 NY2d 718 [1988]; State of New York v Fine, 72 NY2d 967 [1988]). We have recognized that section 352-e "dramatically altered the common-law rule" of caveat emptor (Kerusa, 12 NY3d at 244-245).
In Rachmani Corp. (71 NY2d 718), an action arising from alleged violations of section 352-e brought under the antifraud provisions of the Martin Act, we addressed what constituted a material omission sufficient to support an injunction under section 353 and Executive Law § 63 (12). We answered that question by looking, not to our own common law, but to decisions of the federal courts construing federal securities laws, which are referenced in the Martin Act. We adopted the federal objective test, concluding that an omitted fact is material for{**31 NY3d at 632} purposes of liability under the Martin Act if there is a substantial likelihood that a reasonable investor would consider it important in light of the "total mix" of information available (id. at 726-727). We also reaffirmed that the Attorney General need not prove scienter or intentional fraud in a Martin Act enforcement proceeding (id. at 725 n 6). It is undisputed that the Attorney General need not prove reliance on the part of any investor (see State of New York v Sonifer Realty Corp., 212 AD2d 366, 367 [1st Dept 1995]).
We have repeatedly held that the Martin Act does not create a private right of action in favor of parties injured by prohibited fraudulent practices (CPC Intl. v McKesson Corp., 70 NY2d 268 [1987]; Vermeer Owners v Guterman, 78 NY2d 1114 [1991]) and that "a private litigant may not pursue a common-law cause of action where the claim is predicated solely on a violation of the Martin Act or its implementing regulations and would not exist but for the statute" (Assured Guar., 18 NY3d at 353 [emphasis added]). The premise of such a holding is, of course, that the Martin Act covers some fraudulent practices not prohibited elsewhere in statutory or common law. That the Martin Act expands upon, rather than codifies, the common law of fraud was further reinforced by our decision in Assured [*5]Guar., in which we held that the Martin Act does not preempt common-law causes of action possessed by injured parties, except where predicated on violations of the Martin Act itself or its implementing regulations (id.).
In sum, the Martin Act imposes numerous obligations—or "liabilities"—that did not exist at common law, justifying the imposition of a three-year statute of limitations under CPLR 214 (2). The broad definition of "fraudulent practices," as repeatedly amended by the legislature and interpreted by the courts, encompasses "wrongs" not cognizable under the common law and dispenses, among other things, with any requirement that the Attorney General prove scienter or justifiable reliance on the part of investors. In this respect, the Martin Act is comparable to a claim brought under General Business Law § 349 (h), the statute prohibiting "deceptive practices" in consumer-orientated marketing and sales, which we addressed in Gaidon II. To be sure, there are distinctions between the Martin Act and General Business Law § 349. Unlike the Martin Act, and in addition to permitting enforcement by the Attorney General, the legislature specifically authorized a private right of action under section 349 by adding subdivision (h) permitting{**31 NY3d at 633} suit by parties injured by deceptive practices (cf. CPC Intl., 70 NY2d 268; Vermeer Owners, 78 NY2d 1114). Moreover, the term "deceptive practices" has never been defined by the legislature. But the term "deceptive practices" has been interpreted broadly to encompass wrongful conduct not previously actionable on a common-law fraud theory (see Gaidon v Guardian Life Ins. Co. of Am., 94 NY2d 330 [1999] [Gaidon I]). In Gaidon II, we held that a General Business Law § 349 action is governed by CPLR 214 (2), emphasizing the distinctions between such a claim and common-law fraud, including that section 349 broadly covers "deceptive practices," not just fraudulent marketing and sales practices previously condemned by the courts. The same principles apply here with respect to "fraudulent practices" claims under the Martin Act. We therefore conclude the three-year statute of limitations in CPLR 214 (2)—applicable to "a liability, penalty or forfeiture created or imposed by statute"—governs Martin Act claims.
III.
Turning to the Attorney General's Executive Law § 63 (12) claim, the definition of fraud and fraudulent practices in Executive Law § 63 (12)—added to the statute in 1965—is virtually identical to language found in section 352 of the Martin Act (see L 1965, ch 666). Indeed, the provision was amended pursuant to a program bill offered by the Attorney General intending to "equate the meaning of the words 'fraud' and 'fraudulent' as used therein with the provisions of the Martin Act" (Mem of Atty Gen Louis J. Lefkowitz to Governor, Bill Jacket, L 1965, ch 666 at 3, 1965 NY Legis Ann at 30). The parties dispute whether Executive Law § 63 (12) provides a stand-alone cause of action, rather than merely authorizing the Attorney General to pursue fraud claims under other statutes or common-law theories on a "look through" basis. However, even assuming without deciding that such a freestanding cause of action exists encompassing, like the Martin Act analogue, broader liability than condemned at common law, such a claim would be governed by CPLR 214 (2).
But this does not end the inquiry because it is undisputed that Executive Law § 63 (12) gives the Attorney General standing to redress liabilities recognized elsewhere in the law, expanding the scope of available remedies. To determine whether such a claim is timely, courts must "look through" Executive Law § 63 (12) and apply the statute of limitations applicable{**31 NY3d at 634} to the underlying liability. Hence, in State of New York v Cortelle Corp. (38 NY2d 83, 86-87 [1975]), we applied a six-year statute of limitations to an Executive Law § 63 (12) claim premised on conduct that, if proved, would have constituted a "classic wrong on a common-law theory of promissory fraud." Here, while the lower courts concluded that a six-year statute of limitations applied to defendants' Executive Law § 63 (12) claim—regardless of whether the specific elements of common-law fraud had been made out—that holding was not correct. Rather, it is necessary to examine whether the conduct underlying the Executive Law § 63 (12) claim amounts to a type of fraud recognized in the common law and, if so, the action will be governed by a six-year statute of limitations (see id.). Although the parties raised various arguments with respect to this question, not all the issues were addressed or resolved by the lower courts. A remittal—which permits consideration of the question in the current procedural posture—is therefore appropriate. If it is determined that the prima facie elements of a common-law cause of action were made out in this case, the Attorney General will be obliged to demonstrate each such element at the proof stage or the claim will be subject to dismissal as time-barred.
Accordingly, the order of the Appellate Division should be modified, without costs, by granting that branch of defendant's motion which was to dismiss the first cause of action in the complaint pursuant to CPLR 3211 (a) (5) as [*6]time-barred and remitting the case to Supreme Court for further proceedings in accordance with this opinion and, as so modified, affirmed. The certified question should be answered in the negative.

Feinman, J. (concurring). On constraint of our precedents, I agree with the majority that CPLR 214 (2) applies to civil enforcement actions brought under the Martin Act on the basis of a "fraudulent practice" as defined in General Business Law § 352 (1) (see majority op at 
629-633).[FN1] I write separately to {**31 NY3d at 635}expand upon the Executive Law § 63 (12) issue, although the analysis that follows in this opinion is entirely consistent with the majority's holding (see id. at 
633-634).
The majority holds that the instant Executive Law § 63 (12) claim is timely if the "conduct underlying" the claim "amounts to a type of fraud recognized in the common law" (id. at 
634). On a basic level, I agree with this proposition, as it merely restates the long-standing rule we announced in State of New York v Cortelle Corp. (38 NY2d 83 [1975]). Without further elaboration, however, this statement would do little to aid in resolving the dispute before us; the crux of this case depends on what we mean when we refer to "common-law" fraud. In fact, as explained below, it need only be alleged that Credit Suisse made material misrepresentations of fact and that investors justifiably relied on those misrepresentations. This rule is compelled by an application of the Court's holding to settled jurisprudence (see Seneca Wire & Mfg. Co. v Leach & Co., 247 NY 1, 8 [1928]; Bloomquist v Farson, 222 NY 375 [1918]; Hammond v Pennock, 61 NY 145 [1874]). Neither scienter nor pecuniary damages need be alleged.
[*7]
In addition, the majority remits for consideration of whether, in this case, the Executive Law § 63 (12) claim is based on fraud recognized in the common law. In my view, further guidance on this point is necessary to aid Supreme Court in its task on remittal. Therefore, I write separately to bring into clearer focus one dispositive issue left unresolved in the lower courts. While the lower courts—correctly, in my view—determined that the Attorney General's complaint adequately pleaded facts amounting to equitable fraud, it remains to be considered whether the presence of certain disclaimers in Credit Suisse's marketing materials defeats any allegation of equitable fraud based on those materials. Inasmuch as the majority determines that this question must be decided by Supreme Court in the first instance, I concur.{**31 NY3d at 636}
I. Scope of Executive Law § 63 (12)
Executive Law § 63 (12) provides that
"[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York . . . for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts [and] directing restitution and damages . . . ."
This language authorizes the Attorney General to sue in two distinct (though possibly overlapping) circumstances. First, the Attorney General may bring suit against a defendant engaged in "repeated . . . illegal acts" or "persistent . . . illegality" (emphasis added), such as where the defendant has violated the provisions of some other statutory or common-law duty (see e.g. People v Wells Fargo Ins. Servs., Inc., 16 NY3d 166 [2011] [breaches of fiduciary duty]; People v Apple Health & Sports Clubs, 80 NY2d 803 [1992] [violations of General Business Law § 622-a]; Matter of State of New York v Ford Motor Co., 74 NY2d 495 [1989] [violations of General Business Law § 198-a]). Second, the Attorney General may sue a defendant engaged in "repeated fraudulent . . . acts" or "persistent fraud" (emphasis added), regardless of whether such conduct violates another statute (see People v American Motor Club, 179 AD2d 277, 283-284 [1st Dept 1992], appeal dismissed 80 NY2d 893 [1992]).
The words "fraud" or "fraudulent" are defined to "include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions" (Executive Law § 63 [12]). This definition was drafted to "equate the meaning of the words 'fraud' and 'fraudulent' . . . with the provisions of the Martin Act, General Business Law, Art. 23-A, § 352, dealing with fraudulent acts in the sale of securities and commodities" (see Mem of Atty Gen Louis J. Lefkowitz to Governor, Bill Jacket, L 1965, ch 666 at 3, 1965 NY Legis Ann at 30-31), and the antifraud language in these two statutes is "virtually identical" (State of New York v Rachmani Corp., 71 NY2d 718, 721 n 1 [1988]; see People v Greenberg, 21 NY3d 439, 446 [2013]). Under the Martin Act, a "fraudulent practice" includes "any device, scheme or artifice to defraud or for obtaining money or property by means of any false pretense, representation{**31 NY3d at 637} or promise" and "any deception, misrepresentation, concealment, suppression, fraud, false pretense or false promise" (General Business Law § 352 [1]).
It is axiomatic that "when [the legislature] borrows language from one statute and incorporates it into a second statute, the language of the two acts should be interpreted the same way" (Greenwood Trust Co. v Commonwealth of Mass., 971 F2d 818, 827 [1st Cir 1992], cert denied 506 US 1052 [1993]; see Matter of Friedman v Rice, 30 NY3d 461, 479-480 [2017]). Under the Martin Act, the terms "fraud" and "fraudulent" are "to be given a wide meaning so as to embrace all deceitful practices contrary to the plain rules of common honesty, including all acts, even though not originating in any actual evil design to perpetrate fraud or injury upon others, which do tend to deceive or mislead" (People v Lexington Sixty-First Assoc., 38 NY2d 588, 595 [1976]; see People v Federated Radio Corp., 244 NY 33, 38-39 [1926]), and neither scienter nor reliance need be proved (see Rachmani Corp., 71 NY2d at 725-726; People v Taylor, 304 AD2d 434, 435 [1st Dept 2003], lv denied 100 NY2d 566 [2003]; State of New York v Sonifer Realty Corp., 212 AD2d 366, 367 [1st Dept 1995]). There can be little doubt that, under Executive Law § 63 (12), the concept of fraud is equally broad in scope (see State of New York v General Motors Corp., 48 NY2d 836 [1979], revg on dissenting op below 63 AD2d 885, 886 [1st Dept 1978] [stating that a defendant may violate Executive Law § 63 (12) where the "meaning and probable effect" of its advertisements was to "convey( ) or foster( )" a mistaken belief among the consuming public, regardless of "whether any particular customers did or did not have this belief"]; People v Greenberg, 95 AD3d 474, 483 [1st Dept 2012], affd 21 NY3d 439 [2013]; People v Coventry First LLC, 52 AD3d 345, 345 [1st Dept 2008], affd 13 NY3d 108 [2009], rearg denied 13 NY3d 758 [2009]; People v General Elec. Co., 302 AD2d 314, 314 [1st Dept 2003]; People v Concert Connection, 211 AD2d 310, 320 [2d Dept 1995], appeal dismissed [*8]86 NY2d 837 [1995]; Matter of Lefkowitz v Bull Inv. Group, 46 AD2d 25 [3d Dept 1974], lv denied 35 NY2d 647 [1975]).
II. Statute of Limitations Governing Executive Law § 63 (12)
Our lodestar concerning the timeliness of a fraud claim under Executive Law § 63 (12) is Cortelle (38 NY2d 83). There, the Court held that, while the statute's antifraud language "may in part expand the definition of fraud so as to create a new liability{**31 NY3d at 638} in some instances, it also incorporates already existing standards applied to fraudulent behavior always recognized as such," and "provide[s] particular remedies and standing in a public officer to seek redress on behalf of the State and others" for such preexisting liability (id. at 86, 87). Accordingly, Cortelle held that Executive Law § 63 (12) claims are not governed by CPLR 214 (2) in cases where "the kind of wrong the Attorney-General seeks to redress is not a new one to the decisional law," but rather one deemed "wrongful prior to and independent of the Executive Law" (id.).
Cortelle did not elaborate upon what it would mean for a defendant's fraud to constitute "new liability" as opposed to an "existing standard[ ] [of] fraudulent behavior always recognized as such" (id. at 87). Nor did it provide much guidance as to the appropriate statute of limitations to apply in the latter cases. In this case, the question is now squarely before us, and the parties' views could not be more divergent. Credit Suisse insists that the statute creates or imposes a new liability within the meaning of CPLR 214 (2) to the extent it dispenses with scienter or justifiable reliance; the Attorney General counters that courts of equity had not traditionally required either of these elements.
A. CPLR 213 (8) Applies to Executive Law § 63 (12) Claims Based on Actual Fraud
All parties agree that Executive Law § 63 (12) imposes liability for what our cases often refer to as actual fraud. The prima facie elements of an actual fraud claim are (1) a material misrepresentation of fact, (2) knowledge by the defendant of its falsity, (3) an intent to induce reliance, (4) justifiable reliance and (5) damages (see Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009]; Ross v Louise Wise Servs., Inc., 8 NY3d 478, 488 [2007]).
CPLR 213 (8) will govern the timeliness of an Executive Law § 63 (12) claim premised on conduct satisfying the five Eurycleia Partners elements. Under CPLR 213 (8), "action[s] based upon fraud" must be commenced within the greater of six years from the date the cause of action accrued or two years from the time the plaintiff discovered or could with reasonable diligence have discovered the fraud. For purposes of CPLR 213 (8), "fraud" means actual fraud (see Erbe v Lincoln Rochester Trust Co., 3 NY2d 321 [1957] [interpreting Civil Practice Act § 48 (5)]; Nasaba Corp. v Harfred Realty Corp., 287 NY 290, 294-295 [1942] [same]; Kaufman v Cohen, 307 AD2d 113, 119-123{**31 NY3d at 639} [1st Dept 2003]; Abbate v Abbate, 82 AD2d 368, 386-387 [2d Dept 1981]; Quadrozzi Concrete Corp. v Mastroianni, 56 AD2d 353, 355-356 [2d Dept 1977], appeal dismissed 42 NY2d 824 [1977]). For CPLR 213 (8) to apply, the Attorney General need not expressly plead that the defendant engaged in "actual fraud" or recite any talismanic words. Rather, the court must "look to the essence of plaintiff's claim" (Cortelle, 38 NY2d at 86; see Brick v Cohn-Hall-Marx Co., 276 NY 259, 264 [1937]) and determine whether "the gravamen of the cause of action is . . . injury sustained as a result of [actual] fraud" (Nasaba, 287 NY at 294, quoting Hearn 45 St. Corp. v Jano, 283 NY 139, 141 [1940]; see Erbe, 3 NY2d at 325-326; Kaufman, 307 AD2d at 120; Abbate, 82 AD2d at 386-387).
B. CPLR 213 (1) Applies to Executive Law § 63 (12) Claims Based on Equitable Fraud
Because the scope of "fraud" and "fraudulent" acts under Executive Law § 63 (12) tacks onto the definition of a "fraudulent practice" under the Martin Act, it embraces a much wider universe of conduct than actual fraud alone.
In Federated Radio (244 NY 33), this Court considered whether defendants could be charged under the Martin Act for misrepresenting the value of securities for sale, even though it was not alleged that they did so intentionally. In holding that the defendants could be so charged, the Court held that the Martin Act was broad enough to embrace "a species of conduct commonly, although perhaps inaccurately, called equitable fraud" (id. at 41). By "equitable [*9]fraud," the Court referred to "[m]aterial misrepresentations," though innocent or unintentional, "on which an action might be maintained in equity to rescind a consummated transaction" (id. at 40-41). It is well-established that an action for rescission requires only proof of (1) a material misrepresentation of fact and (2) justifiable reliance that induced the aggrieved party to enter into the transaction (see Seneca Wire & Mfg. Co., 247 NY at 7-8; Bloomquist, 222 NY 375; Hammond, 61 NY 145; Jack Kelly Partners LLC v Zegelstein, 140 AD3d 79, 85 [1st Dept 2016], lv dismissed 28 NY3d 1103 [2016]; Board of Mgrs. of the Soundings Condominium v Foerster, 138 AD3d 160, 164 [1st Dept 2016]; Steen v Bump, 233 AD2d 583, 584 [3d Dept 1996], lv denied 89 NY2d 808 [1997]; D'Angelo v Hastings Oldsmobile, 89 AD2d 785 [4th Dept 1982], affd 59 NY2d 773 [1983]; Albany Motor Inn & Rest. v Watkins, 85 AD2d 797 [3d Dept 1981], lv denied 56 NY2d 508 [1982]; Fox v Heatherton, 281 App Div 748 [2d Dept{**31 NY3d at 640} 1953]; Stern v Satra Corp., 539 F2d 1305, 1308 [2d Cir 1976]; 23 Williston on Contracts § 69:49 [4th ed]; 16 NY Jur 2d, Cancellation of Instruments §§ 4, 24-25).[FN2]
Under CPLR 213 (1), "an action for which no limitation is specifically prescribed by law" must be commenced within six years. This residuary provision is intended to apply to, among other things, actions of an equitable nature to which no other statute of limitations is applicable (see Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 816 [2003]; Loengard v Santa Fe Indus., 70 NY2d 262, 266-267 [1987]; David D. Siegel & Patrick M. Connors, New York Practice § 36 [6th ed 2018]). Traditionally, an action for equitable rescission is governed by CPLR 213 (1), except where the grounds to rescind the transaction are based on the defendant's actual fraud, in which case CPLR 213 (8) will apply instead (see Greene v Greene, 56 NY2d 86, 93 [1982]; Rubin v Rubin, 275 AD2d 404, 405 [2d Dept 2000], appeal dismissed 95 NY2d 958 [2000]; Van Dussen-Storto Motor Inn v Rochester Tel. Corp., 63 AD2d 244, 250 [4th Dept 1978]; cf. Abbate, 82 AD2d at 386-387).{**31 NY3d at 641}
Similarly, CPLR 213 (1) will apply to Executive Law § 63 (12) where a defendant's conduct satisfies the two elements of equitable fraud—material misrepresentation of fact and justifiable reliance—but fails to amount to actual fraud, whether due to the absence of scienter, intent to induce reliance, or damages to the defrauded party (see Eurycleia Partners, 12 NY3d at 559). Although it may be argued that the statute of limitations for equitable rescission should not apply where, as here, the Attorney General seeks an entirely different set of remedies—restitution and injunctive relief—this argument misses the mark. Equitable rescission is undoubtedly a form of "liability" within the meaning of CPLR 214 (2) (see Hartnett v New York City Tr. Auth., 86 NY2d 438, 444 [1995] ["(T)he term 'liability,' as it is used in (CPLR 214 [2])," does not refer "only to obligations measurable in money damages"]). The mere fact that the statute codifying this form of liability enlarges the remedy or invests a new party, here the Attorney General, with standing to seek relief, does not mean that it has "created or imposed" that liability (see Melcher v Greenberg Traurig, LLP, 23 NY3d 10, 15 [2014]; Cortelle, 38 NY2d at 88).
C. CPLR 214 (2) Applies to Executive Law § 63 (12) Claims That Do Not Amount to Either Actual or Equitable Fraud
Finally, to the extent that Executive Law § 63 (12) does not require a showing of justifiable reliance, but only conduct that would tend to deceive or mislead (see General Motors Corp., 48 NY2d 836; Matter of People v Trump Entrepreneur Initiative LLC, 137 AD3d 409, 417 [1st Dept 2016]; Matter of People v Applied Card Sys., Inc., 27 AD3d 104, 106-108 [3d Dept 2005], lv dismissed 7 NY3d 741 [2006]), it applies to a class of fraud far broader than anything actionable at common law. What the common law condemns as fraudulent is not merely the making of a misrepresentation, but the making of a misrepresentation that actually misleads someone (see 26 Williston on Contracts § 69:2 [4th ed 2003] ["There is simply a mistake if the erroneous belief was not induced by the other party. . . . (M)ere mistake does not constitute fraud such as will give rise to damages or vitiate a contract even under the most liberal definition"]; 1 William W. Kerr & Orlando F. Bump, A Treatise on the Law of Fraud and Mistake 94 [1872] ["Misrepresentation, however, goes for nothing either at law or in equity unless a (person) has been misled thereby to (their) prejudice"]; 1 Joseph Story, Commentaries on Equity Jurisprudence § 191 [6th ed 1853] ["(I)t is not only necessary to establish the fact of misrepresentation; but . . . that it actually does mislead (them)"]).
{**31 NY3d at 642}Therefore, CPLR 214 (2) will govern the timeliness of an Executive Law § 63 (12) claim that does not rise to the level of either actual or equitable fraud, whether because the defendant did not make a material misrepresentation of fact, or because no person justifiably relied on that misrepresentation. Although such claims may be "akin to" a common-law cause of action, they nevertheless "would not exist but for the statute" (Gaidon, 96 NY2d at 209 [emphasis omitted], quoting Matter of Motor Veh. Acc. Indem. Corp. v Aetna Cas. & Sur. Co., 89 NY2d 214, 220-221 [1996]).
III. Remittal is Appropriate to Determine Whether the Marketing Material Disclaimers Preclude Justifiable Reliance
The previous section established that both actual and equitable fraud qualify as fraud "recognized in the common or decisional law" (Cortelle, 38 NY2d at 86) and that, under an equitable fraud theory, the Attorney General is required to allege that a [*10]material misrepresentation was made and that investors justifiably relied upon the misrepresentation. This section analyzes whether the elements of equitable fraud have been made out in this case and identifies the unresolved issue pertinent to this inquiry that Supreme Court should consider upon remittal.
"On a motion to dismiss pursuant to CPLR 3211, the pleading is to be afforded a liberal construction . . . . We accept the facts as alleged in the complaint as true [and] accord plaintiffs the benefit of every possible favorable inference" (Leon v Martinez, 84 NY2d 83, 87 [1994]). Looking first within the four corners of the pleadings, it is beyond cavil that the Attorney General adequately pleaded the elements of equitable fraud.
With respect to the material misrepresentation element, Credit Suisse allegedly stated in its prospectus supplements and private placement memoranda (collectively, offering materials) that its underlying loans were originated "generally in accordance with" applicable underwriting standards, "that the mortgagor's monthly income . . . [would] be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan," and that "a 'reasonableness test' " was applied to stated borrower income levels. In addition, Credit Suisse is alleged to have lied about the quality of its due diligence review in its marketing materials, stating, among other things, that "[a]ll the information on the loan application is reviewed for completeness and reconciled to the borrower's credit report, as{**31 NY3d at 643} applicable," which review included "[an] analysis of borrower's use of credit, borrower's prior mortgage payment history, and borrower's debt to income ratios." According to the complaint, Credit Suisse further represented in its marketing materials that it sought to "influence" originators to "utilize" "appropriate origination practices."
According to the Attorney General, these statements were false: many of the loans had inflated income and fabricated documentation, Credit Suisse's originators adhered to poor underwriting guidelines, "due diligence reviews did not involve the rigorous examination of loans that Defendants repeatedly represented that they were undertaking," and, far from encouraging originators to use "appropriate origination practices," Credit Suisse "routinely gave concessions to originators, rewarding them for volume without regard to quality."
The complaint adequately pleads that investors justifiably relied on the foregoing misstatements. The complaint alleges that Credit Suisse "led investors to believe" that it had carefully evaluated and would continue to monitor the underlying loans and that they would encourage loan originators to use sound origination practices. These representations, according to the complaint, were "critical" to investors' understanding of the riskiness of the loans. Furthermore, the complaint alleges that investors "had a right to rely" on Credit Suisse's representations concerning its due diligence considering Credit Suisse's unique access to critical information. The prospectus, as Credit Suisse acknowledged in its motion to dismiss, stated: "You should rely only on the information provided in this prospectus and the accompanying prospectus supplement, including the information incorporated by reference."
"The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive" (DDJ Mgt., LLC v Rhone Group L.L.C., 15 NY3d 147, 155 [2010] [citation and internal quotation marks omitted]). "Although defendants contend that plaintiff . . . will ultimately be unable to prove [its] claim that [investors] justifiably relied upon [defendants'] alleged statements," here the Attorney General's allegations of justifiable reliance are "sufficiently detailed and specific" to survive a motion to dismiss (Ford v Phillips, 121 AD3d 1232, 1235 [3d Dept 2014]).
However, this does not end the inquiry. "When evidentiary material is considered" in connection with a motion to dismiss {**31 NY3d at 644}that has not been converted into a motion for summary judgment,
"the criterion is whether the proponent of the pleading has a cause of action, not whether [they have] stated one, and, unless it has been shown that a material fact as claimed by the pleader to be one is not a fact at all and unless it can be said that no significant dispute exists regarding it, . . . dismissal should not eventuate" (Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977]; see Carlson v American Intl. Group, Inc., 30 NY3d 288, 301 [2017]; Rappaport v International Playtex Corp., 43 AD2d 393, 394-395 [3d Dept 1974]).
Here, in connection with its motion to dismiss, Credit Suisse points to language in its marketing materials stating that they "may not be used or relied upon for any purpose other than as specifically contemplated by a written agreement with" Credit Suisse. It is well-established that the presence of disclaimers or other cautionary language may preclude a claim of common-law fraud by rendering any resulting reliance unjustified (see Pappas v Tzolis, 20 NY3d 228, 233 [2012]; Wittenberg v Robinov, 9 NY2d 261 [1961]; Danann Realty Corp. v [*11]Harris, 5 NY2d 317 [1959]). Supreme Court reserved the question of whether these disclaimers precluded justifiable reliance (see 46 Misc 3d 1211[A], 2014 NY Slip Op 51912[U], *7-8 [2014]).
In light of the rule we announce today, remittal is appropriate on this narrow issue so that Supreme Court may determine, in the first instance, whether investors' reliance on the marketing materials was justifiable, notwithstanding these disclaimers. If so, then the motion to dismiss the Executive Law § 63 (12) claim should be denied with respect to any material misstatements within the scope of those disclaimers; otherwise, the motion with respect to these statements should be granted. In either case, the motion to dismiss the Executive Law § 63 (12) claim should be denied with respect to any misstatements outside the scope of these disclaimers, including representations that Credit Suisse is alleged to have made in its offering materials. The complaint adequately alleges that these misstatements were material and that investors justifiably relied on them, and Credit Suisse has not argued that the offering materials were subject to similar disclaimers.

Rivera, J. (dissenting). The primary issue presented by the {**31 NY3d at 645}question certified from the Appellate Division is which statute of limitations applies to enforcement actions by the Attorney General of the State of New York under General Business Law § 352, commonly known as the Martin Act, and Executive Law § 63 (12). Since the Martin Act authorizes enforcement against all acts of fraud involving securities known to courts at the time of its enactment, and Executive Law § 63 (12) includes this same category of fraud as a subset of the statute's prohibition on a broader universe of illegal business practices, the applicable statute of limitations in actions brought under both statutes for fraudulent acts known under previous decisional law is six years, as provided by CPLR 213 (8).[FN1] Defendants concede that, under that provision, the Attorney General's complaint was timely filed. Therefore, the Appellate Division properly affirmed the denial of defendant's CPLR 3211 (a) (5) motion to dismiss on timeliness grounds. As such, there is no legal basis for the Court's remittal as there is nothing to reconsider in this regard. I dissent.
[*12]I.
My colleagues hold that claims brought under the Martin Act are subject to the three-year statute of limitations set forth in CPLR 214 (2). To reach that conclusion, they misread this Court's precedent and conflate the elements a private party must establish to be granted a remedy with the Attorney General's authority to seek a wide range of relief on behalf of the State for an "old and common type of fraud" (State of New York v Cortelle Corp., 38 NY2d 83, 86 [1975]). Simply put, the majority and concurrence erroneously presume that the applicable statute of limitations is determined by abstract reference to the legal basis for the Attorney General's standing and the relief sought. The Court has rejected this restrictive view of the law and adopted a more nuanced approach when deciding the timeliness of the Attorney General's enforcement actions.
A.
New York's legislature has specially empowered the Attorney General to uphold the integrity of the securities markets and{**31 NY3d at 646} protect investors from all types of fraud (see General Business Law §§ 352-353; Executive Law § 63 [12]; see also Cortelle, 38 NY2d at 86-88). For close to a century, the Attorney General has exercised its authority under the Martin Act "to prevent fraudulent securities practices by investigating and intervening at the first indication of possible securities fraud on the public and, thereafter, if appropriate, to commence civil or criminal prosecution" (CPC Intl. v McKesson Corp., 70 NY2d 268, 277 [1987]; see also General Business Law §§ 352, 352-c, 353). The legislature deemed this broad authority crucial to achieving its aim: "to prevent all kinds of fraud in connection with the sale of securities and commodities and to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited" (People v Federated Radio Corp., 244 NY 33, 38 [1926] [citation omitted]).
In securities enforcement actions, the Attorney General has also relied on Executive Law § 63 (12) to prosecute those engaged in "repeated fraudulent or illegal acts" by seeking injunctions, restitution, and damages. This statute encompasses actions that fall within the ambit of the Martin Act, but also reflects the legislature's intent to reach beyond what was previously recognized as fraudulent conduct. In State of New York v Cortelle Corp., the Court explained that "[w]hile [Executive Law § 63 (12)] may in part expand the definition of fraud so as to create a new liability in some instances, it also incorporates already existing standards applied to fraudulent behavior always recognized as such" (38 NY2d at 87 [citations omitted]). In addition, Executive Law § 63 (12) applies to business practices that constitute "repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality," both in and outside the securities industry (emphasis added).
There is no doubt that the legislature intended the Attorney General's enforcement powers to be expansive. We are reminded of the wisdom of this legislative choice with every insider trading scandal, every stock market crash, and every fraudulent securities scheme that can be traced back to deceptive or misleading practices intended to lure investors (see generally John Kenneth Galbraith, The Great Crash, 1929 [1955]; Charles P. Kindleberger, Manias, Panics and Crashes: A History of Financial Crises [1978]; Carmen M. Reinhart & Kenneth S. Rogoff, This Time is Different: Eight Centuries of Financial Folly [2009]).
The underlying complaint in this case is a prime example of the type of enforcement action brought by the Attorney General{**31 NY3d at 647} as protector of our financial sector. At issue is nothing less than defendants Credit Suisse Securities (USA) LLC and its affiliated entities' alleged role in exacerbating the greatest financial disaster of the last 30 years, which ruined the livelihoods of millions of people, and whose negative geopolitical consequences continue to be felt at home and abroad (see generally David B. Grusky, Bruce Western & Christopher Wimer, The Great Recession [2011]; Maria A. Arias & Yi Wen, Recovery from the Great Recession Has Varied around the World, The Regional Economist, Federal Reserve Bank of St. Louis [Oct. 2015]; Diego Muro & Guillem Vidal, Mind the Gaps: The Political Consequences of the Great Recession in Europe, Euro Crisis in the Press, London School of Economics and Political Science, June 10, 2014).[FN2] In the last few years, journalists, academics, and economists have come to understand the central role that fraudulent conduct by investment banks may have played in creating the conditions for the crisis (see e.g. Maybe It Was Fraud After All, Democracy in America, The Economist, Oct. 13, [*13]2010; see also Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., 30 NY3d 572, 596-597 [2017, Rivera, J., dissenting]).
The defendants here are alleged to have engaged in just such practices, knowingly misleading investors in ways that caused tremendous harm to our financial system and the public at large. In speaking with investors, Credit Suisse repeatedly represented that the loans underlying the residential mortgage-backed securities (RMBS) it sold had been originated in line with proper underwriting standards, and that the bank itself carefully sought out loans from borrowers with a demonstrated ability and willingness to repay their debts, in order to ensure the bank's securities remained attractive investment options. According to the Attorney General, these were lies. Despite its representations to investors, Credit Suisse's due diligence was superficial. It was also often irrelevant, since loans that internal checks suggested failed to meet the bank's standards were nevertheless included in the RMBS in large numbers. In sum, defendants knew that many of the loans they pooled in their securities were fundamentally flawed. This was not an accident, but a feature of the bank's business culture and securitization practices, which incentivized production numbers{**31 NY3d at 648} over quality. The bank created incentives for its loan originators based on the volume of mortgages they generated for the bank, and not on those loans' performance. The bank licensed exceptions to key components of loan underwriting guidelines in the interest of keeping loan volume high and sought to appease high-volume originators. At the same time, the bank claimed to potential investors that it was influencing loan originators only to identify good borrowers and produce good loans. The bank's words and its deeds did not align. Ultimately, many of the loans went into delinquency, the securities saw their credit rating drastically downgraded, investors suffered terrible losses, and taxpayers were left holding the bill.
B.
Credit Suisse unsuccessfully moved to dismiss the Attorney General's complaint, in part, as time-barred pursuant to CPLR 3211 (a) (5). Credit Suisse argued that the causes of action pleaded in the complaint were subject to the three-year statute of limitations of CPLR 214 (2), because it faced "an action to recover upon a liability . . . created or imposed by statute," namely the Martin Act and Executive Law § 63 (12). The Attorney General responded that the claims against Credit Suisse are governed by the six-year statute of limitations in CPLR 213, either under subdivision (1) as applied to "an action for which no limitation is specifically prescribed by law," or subdivision (8) for "an action based upon fraud." The Supreme Court denied Credit Suisse's motion to dismiss, and the Appellate Division affirmed. The Court subsequently certified to us the question whether Supreme Court's order, as affirmed, had been properly made.
The plain language of CPLR 214 (2) states that it applies "except as provided in" section 213, meaning section 213 will govern an action falling within its purview, regardless of whether the action seeks to recover upon a liability imposed by statute.[FN3] In other words, if section 213 applies, a party's cause of action is not governed by CPLR 214 (2). Under this construction of sections 213 and 214, the Attorney General's causes of{**31 NY3d at 649} action for investor fraud are not time-barred, as they are subject to the six-year statute of limitations under either CPLR 213 (1) because they are not subject to a limitation period prescribed by law, or, alternatively, because they are undisputedly grounded in fraud and thus governed by CPLR 213 (8).
II.
[*14]The Court held in Cortelle that "a statute[,] in regulating a substantive right or the procedure for its enforcement[,] does not create or impose a liability, penalty or forfeiture" within the meaning of CPLR 214 (2) (38 NY2d at 89). The Attorney General's standing to sue for remedies provided for under the Martin Act, then, does not transform the alleged fraudulent conduct by Credit Suisse into acts previously unknown to the courts. So long as the wrong was one previously recognized, the fact that the Attorney General files suit rather than a private investor does not affect the statute of limitations analysis.
A.
The fraud asserted by the Attorney General was well known to the courts when the Martin Act was enacted. Courts in the Anglo-American world had long and uniformly understood acts like those alleged here to be fraudulent (see e.g. Reusens v Gerard, 160 App Div 625 [1st Dept 1914], affd sub nom. de Ridder v Gerard, 221 NY 665 [1917]). My colleagues have reached the astonishing conclusion that (1) because the Martin Act imposes obligations on securities dealers that did not exist at common law, (2) because it does not create a private right of action, and (3) because the legislature has subsequently amended the definition of fraudulent practices to "encompass[ ] 'wrongs' not cognizable under the common law and dispense[d] . . . with any requirement that the Attorney General prove scienter or justifiable reliance on the part of investors" in prosecuting investor fraud (majority op at 
632-633), the Attorney General's civil suits to punish fraudulent practices under the Martin Act must be treated as actions not recognized under decisional law at the time of the Martin Act's passage (see majority op at 
626, 633; concurring op at 634 and n 1). This argument is mistaken.
The first two grounds are easily exposed as wholly irrelevant to the statute of limitations analysis. The various obligations referenced by the majority concern registration and disclosure requirements that make the act similar to federal Blue Sky{**31 NY3d at 650} laws (majority op at 
630). However, "[i]n applying a Statute of Limitations it is basic that one looks to the essence of plaintiff's claim" and not to the abstract statutory regime (Cortelle, 38 NY2d at 86). We look, then, to the underlying nature of the claim itself (see Matter of Paver & Wildfoerster [Catholic High School Assn.], 38 NY2d 669, 674 [1976] [observing that "it has been said that the law in this State, in applying the Statute of Limitations, will look to the 'reality' or the 'essence' of the action and not its form" (citations omitted)]). The Attorney General's causes of action allege misrepresentations intended to deceive and lure investors into purchasing securities that were of a lower quality and higher risk than defendants let on. In fact, some of the supposedly safe securities were eventually downgraded to "junk bond" status. This is a straightforward claim that Credit Suisse committed acts of fraud. The forms in which those misrepresentations were presented and the similarities between the Martin Act and its federal analogue do not change the essence of the State's cause of action. Fraud is fraud.
Similarly inconsequential is the fact that the Martin Act does not provide a private cause of action. What does it matter for purposes of our statute of limitations analysis that the legislature exclusively empowered the Attorney General to pursue an action under the Martin Act? The legislature could choose to leave private parties to vindicate their rights for investor fraud under established common-law and equitable fraud principles, while granting the Attorney General authority to act as the watchdog over our financial markets. This, in fact, is what it did. That the law left private parties with their own traditional remedies at law and equity has no effect on the statute of limitations governing the Attorney General's own, comparable actions.
B.
As to the majority's remaining ground, its analysis is unpersuasive. As a threshold matter, as every other court to have considered this complaint has so far concluded, the Attorney General has, here, adequately alleged scienter and reliance—what my colleagues assert are necessary elements of a common-law fraud claim. Consequently, there is no basis to treat the causes of action alleged in the complaint as created by statute within the meaning of CPLR 214 (2), and therefore subject to the shorter, three-year statute of limitations. Moreover, assuming{**31 NY3d at 651} arguendo that the Attorney General did not allege scienter and reliance, that would not subject the causes of action to CPLR 214 (2), because the action would still be based on fraudulent behavior recognized under decisional law when the legislature enacted the Martin Act.
[*15]
In People v Federated Radio Corp., this Court explained that the Martin Act was intended to apply to fraud as understood at the time of the law's enactment (see 244 NY at 38). Although the Martin Act does not define fraud, the Court recognized that the statute's purpose provided all the necessary guidance:
"While certain practices are declared by the act to be fraudulent[,] the definition of a fraudulent practice goes no further than to say that a fraud or a violation of law which would operate as a fraud is a fraudulent practice which may be enjoined, and we must gather from other sources the meaning of the word 'fraud.' In a broad sense the term includes all deceitful practices contrary to the plain rules of common honesty.
"The purpose of the law is to prevent all kinds of fraud in connection with the sale of securities and commodities and to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited. (Hall v. Geiger-Jones Co., 242 U. S. 539.) The words 'fraud' and 'fraudulent practice' in this connection should, therefore, be given a wide meaning so as to include all acts, although not originating in any actual evil design or contrivance to perpetrate fraud or injury upon others, which do by their tendency to deceive or mislead the purchasing public come within the purpose of the law" (244 NY at 38-39).
Federated Radio's recognition that, absent a statutory definition, "we must gather from other sources the meaning of the word 'fraud' " (id. at 38) leads inexorably to the conclusion that fraud, for purposes of the Martin Act, means the forms of fraud recognized at the time of the law's enactment.
At the time the legislature passed the Martin Act, a private party could sue at law for damages under a claim of intentional fraud (also at times referred to as legal, or actual fraud), meaning for "false representations knowingly made and acted on, resulting in damage" (id. at 41). This category of fraud required proof of "representation, falsity, scienter, deception and injury" {**31 NY3d at 652}(Ochs v Woods, 221 NY 335, 338 [1917]).[FN4] In a typical investor fraud case, the plaintiff was required to show that the promoter or seller had made a misrepresentation to the investor about a material aspect of the transaction that the promoter knew was false with the intent of misleading the investor, and that the investor actually and justifiably relied on that misrepresentation and was injured as a result (id.).
However, an action sounding in fraud at law was not the only way to combat this class of wrong. A party unable to establish the elements of intentional fraud could maintain a claim in equity for conduct known as equitable fraud (see Federated Radio, 244 NY at 41; Bloomquist v Farson, 222 NY 375, 380 [1918]). "In equity, the right to relief is derived from the suppression or misrepresentation of a material fact, though there be no intent to defraud" (Hammond v Pennock, 61 NY 145, 152 [1874]). Recognizing that "[e]quity will administer such relief as the exigencies of the case demand," the courts provided that "[a]n action may be maintained in equity to rescind a transaction which has been consummated through misrepresentation of material facts not amounting to [common-law] fraud," since scienter need not even have been alleged (Bloomquist, 222 NY at 380).
Federated Radio explicitly recognized the elements that distinguish equitable fraud from intentional fraud, and further held that the Attorney General is empowered to pursue remedies for both categories of fraud. Scienter need not be proved under the Martin Act because the Attorney General is empowered to pursue actions for equitable fraud [*16]which requires only a "[m]aterial misrepresentation[ ] intended to influence the bargain" without an added "evil design" (244 NY at 38-39, 41; see also Bloomquist, 222 NY at 380; Hammond, 61 NY at 152).
The legislative history supports what the Court recognized in Federated Radio—that the Martin Act is intended to authorize the Attorney General to pursue the widest range of fraud, as understood when the law was passed. In the early twentieth century, in the face of unscrupulous stock "promoters [who] would sell shares in 'the bright blue sky itself,' " states and Congress began enacting laws to regulate the sale of securities{**31 NY3d at 653} (see Ambrose V. McCall, Comments on the Martin Act, 3 Brook L Rev 190, 190 [1933]). These so-called "Blue Sky laws" sought to put in the hands of state actors the ability to pursue a wide range of remedies to combat investor fraud, which had become a systemic problem, affecting the market itself, beyond harm to any individual investor (see generally id. at 192-193). With the Martin Act, New York's Blue Sky law, the legislature empowered the Attorney General to seek redress for fraud on investors in general, and to act before fraudulent behavior impacted the marketplace. Crucially, even as the legislature granted the Attorney General standing to pursue investor fraud claims, it did not intend to create a new form of liability, but simply enabled the Attorney General to seek redress against the many different kinds of fraud already well familiar to the public. The report of the Special Committee that developed the Martin Act makes clear that, with respect to the new powers granted to the Attorney General under the law, the legislature sought to "confer[ ] jurisdiction upon State officials . . . to investigate frauds" and generally "prevent[ ] fraud," not define new frauds (see Governor's Message to Legislature Transmitting Report of Special Comm Appointed by Governor to Provide Proper Supervision & Regulation in Connection with Sec Offered to Pub for Investment, 1920 NY Legis Doc No. 81 at 7, 8 [Report]). Their concern was overwhelmingly with punishing and redeeming "losses which are occasioned by fraud," and they intended the Martin Act to give the Attorney General the power to do so (id. at 9; see also id. at 13-14 [discussing the investigatory and prosecuting powers conferred under the Martin Act as expansions of jurisdiction]). The goal was combating fraud, not defining it. There is no real debate that scienter was not required to maintain a fraud action in equity at that time. In granting the Attorney General the power to combat fraud, the legislature surely also granted the power to pursue equitable fraud actions, for which no scienter need be alleged.
Whether reliance was necessary for the Attorney General to pursue an action based on fraud is a different question. The Attorney General argues that proof of reliance and individual economic loss go to standing, not to the underlying wrongfulness of the conduct. The conduct is wrong without proof of reliance. Reliance, in this context, is simply a mechanism to determine in a potential suit between private parties who has actual standing to bring a claim and what type of remedy is warranted.{**31 NY3d at 654}
This argument finds support in the law, and would further the legislative purpose of the Martin Act to give broad authority to the Attorney General to sue for securities industry fraud. The fraud the legislature sought to address is not solely wrongful conduct that actually succeeds in fooling individual investors, but fraud grounded in deception or misrepresentation related to securities. It is the mere behavior of the intentional malefactor, whose goal is to influence the bargain through a misrepresentation, that renders stocks and securities unreliable. The Martin Act does not require consummation of the intended or innocent misrepresentation, for untrue and inaccurate information is enough to place the public and the securities markets in jeopardy. This is the type of wrong the Martin Act addresses. As the Court has recognized, the Martin Act "does not prohibit fraudulent practices. It merely provides a procedure to prevent them" (Federated Radio, 244 NY at 38). The Attorney General does not have to wait for some individual investor to incur damages or allege reliance to pursue an action under the Martin Act. Indeed, such delay would undermine the legislative purpose "to prevent all kinds of fraud in connection with the sale of securities and commodities and to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited" (id. [citation omitted]).
Exempting the Attorney General from proving reliance and damages in Martin Act claims is part and parcel of the special, well-recognized standing rules that apply to government actors (see e.g. Estados Unidos Mexicanos v DeCoster, 229 F3d 332, 335 [1st Cir 2000] [discussing the long-established "exception to normal rules of standing applied to private citizens" where government actors are concerned]; see generally Alfred L. Snapp & Son, Inc. v Puerto Rico ex rel. Barez, 458 US 592, 600-608 [1982] [discussing the special standing of states acting as quasi-[*17]sovereigns]). The state, in its parens patriae capacity, may act in furtherance of a quasi-sovereign interest in protecting the investing public and the integrity of the marketplace. Specifically:
"Parens patriae is a common-law standing doctrine that permits the state to commence an action to protect a public interest, like the safety, health or welfare of its citizens. To invoke the doctrine, the Attorney General must prove a quasi-sovereign{**31 NY3d at 655} interest distinct from that of a particular party and injury to a substantial segment of the state's population (see Alfred L. Snapp & Son, Inc. v Puerto Rico ex rel. Barez, 458 US 592, 607 [1982]). In varying contexts, courts have held that a state has a quasi-sovereign interest in protecting the integrity of the marketplace (see State of N.Y. by Abrams v General Motors Corp., 547 F Supp 703 [SD NY 1982]; People v H&R Block, Inc., 16 Misc 3d 1124[A], 2007 NY Slip Op 51562[U] [2007])" (People v Grasso, 11 NY3d 64, 69 n 4 [2008]).
The Supreme Court of the United States has long held that a state has a clear quasi-sovereign interest in combating illegal economic practices that harm that state's economy (see Georgia v Pennsylvania R. Co., 324 US 439, 450-451 [1945]). In the legal services context, the United States Supreme Court has specifically recognized a state's interest in policing and preventing "those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct' " (Ohralik v Ohio State Bar Assn., 436 US 447, 462 [1978]). Of course, the state's interest in the integrity of its markets is not confined to the market for legal services; it is, rather, one of its general, fundamental concerns (see e.g. Kelley v Carr, 442 F Supp 346, 356-357 [WD Mich 1977] [including "maintenance of the integrity of markets and exchanges operating within (the state's) boundaries" and "protection of its citizens from fraudulent and deceptive practices" as "(s)urely" among "the most basic of a state's quasi-sovereign interests"], revd in part on other grounds 691 F2d 800 [6th Cir 1980]). For this reason, "[t]he State's goal of securing an honest marketplace in which to transact business is a quasi-sovereign interest" (State of N.Y. by Abrams, 547 F Supp at 705).
Cortelle is instructive on this point because, although the Court in that case was deciding the proper reach of the Attorney General's authority under a different law, the underlying analysis applies with equal force here. In Cortelle, the Attorney General invoked Business Corporation Law § 1101 to address a wrong against the State traceable to English common law and continued under New York's own common law, based on a corporation's alleged persistent fraudulent conduct. The Court held that "the alleged fraudulent acts of the corporate defendants are actionable wrongs against the State, pre-existent to and independent of the enactment of the procedural remedy in section 1101" (38 NY2d at 88). Similarly, {**31 NY3d at 656}the Attorney General here acts under the Martin Act to protect the State's quasi-sovereign interest in the integrity of the marketplace by pleading causes of action for investor fraud—an "old and common type of fraud" (id. at 86; Grasso, 11 NY3d at 69 n 4, citing State of N.Y. by Abrams, 547 F Supp 703; H&R Block, Inc., 16 Misc 3d 1124[A], 2007 NY Slip Op 51562[U]). Here, as in Cortelle, the liability existed long before it was invoked by the Attorney General. The law simply gave the Attorney General the power to enforce it.
C.
My colleagues maintain that Gaidon v Guardian Life Ins. Co. of Am. (96 NY2d 201 [2001] [Gaidon II]) leads to the conclusion that the causes of action asserted by the Attorney General against the Credit Suisse defendants are subject to CPLR 214 (2) (majority op at 
629, 633; concurring op at 634 and n 1), but they are mistaken. Gaidon II stands for two propositions. First, CPLR 214 (2) does not apply to liabilities existing at decisional law even if they are "recognized or implemented by statute," because the governing statute of limitations is that which corresponds to the liability as known at decisional law (96 NY2d at 208, citing Aetna Life & Cas. Co. v Nelson, 67 NY2d 169, 174 [1986]). Second, CPLR 214 (2) governs a cause of action based on conduct that was not recognized at decisional law, but only if the cause of action is based on a statutory provision imposing liability for such conduct. The first proposition is irrelevant to the analysis here because, as I have discussed, the Attorney General's claims are based on investor fraud, which was not only recognized when the Martin Act was enacted, but was the type of fraudulent behavior legislatively targeted by the statute.
The second proposition is of significance but not for the reasons assumed by my colleagues. In Gaidon II, private parties brought an action under General Business Law § 349 for deceptive marketing and sales practices in the [*18]promotion of insurance policies. In prior litigation, the Court had concluded that "[i]n contrast to common-law fraud, General Business Law § 349 is a creature of statute based on broad consumer-protection concerns" and although claims under the statute "have been aptly characterized as similar to fraud claims . . . they are critically different in ways illustrated by the cases at bar" (Gaidon v Guardian Life Ins. Co. of Am., 94 NY2d 330, 343 [1999] [Gaidon I], quoted in Gaidon II, 96 NY2d at 209 {**31 NY3d at 657}[emphases and ellipsis as in Gaidon II]). In Gaidon II the Court explained its prior decision in Gaidon I held that because the promotional illustrations used in selling the offending premium policies contained disclaimers, the misrepresentations in those materials and by the agents did not constitute common-law fraud, but might be actionable under General Business Law § 349 (96 NY2d at 209). As such, section 349 "encompasse[d] a significantly wider range of deceptive business practices that were never previously condemned by decisional law" (id. at 210). This led the Court to hold that the plaintiffs' claims "although akin to common-law causes, would not exist but for the statute . . . in which case CPLR 214 (2) applies" (id. at 209 [internal quotation marks omitted]). The Court did not adopt the rule advocated by Credit Suisse and now employed by my colleagues—that if a statute encompasses a broader range of conduct than recognized under decisional law, all claims under the statute, even the claims that had been previously actionable, will be subject to the three-year statute of limitations prescribed by CPLR 214 (2). The Court in Gaidon II only considered the causes of action as pleaded, and, based on the specific averments, determined that they were "akin to common-law causes" but fell within the broader range of claims "never legally cognizable before [section 349's] enactment" (id. [emphasis omitted]).
Applying the principles of Gaidon II, even if I agreed with my colleagues that the Martin Act encompasses conduct that exceeds that known under decisional law, to the extent the Attorney General here has pleaded causes of action for common-law fraud against Credit Suisse, I would find those causes of action timely filed in accordance with CPLR 213 (8). A different outcome is not legally supported unless we ignore the teachings and logic of our prior case law.
In any event, my colleagues' decision that section 214 (2) applies is based on internally inconsistent reasoning and leads to unintended consequences at odds with legislative purpose. According to my colleagues' approach, a private investor has six years to file an action for intentional fraud but the Attorney General who seeks to assert causes of action for the same conduct under the Martin Act and alleges all the requisite elements to sustain the action has only three years to file. Similarly, a private plaintiff seeking to rescind a transaction under a theory of equitable fraud for having relied on a fraudulent misrepresentation, which does not require proof of scienter,{**31 NY3d at 658} would have six years to bring suit, but the Attorney General, even if it established all the very same elements, would be barred from seeking any remedy after three years, simply for commencing the action under the Martin Act. This result is patently absurd. The legislature clearly invested the Attorney General with greater, not lesser, authority to seek redress than the individual private investor. The legislature granted standing to the Attorney General to exercise its muscular enforcement authority to seek a broad array of remedies on behalf of the People of the State of New York. These broad powers are intended to protect the integrity of the securities markets and the interests of investors. Nevertheless, at a stroke, the majority's holding today makes the Attorney General less able to police the markets than a member of the general investing public.
It surely could not have been the intent of the legislature when it passed CPLR 214 to apply its three-year limitations period to the Attorney General's enforcement actions under the Martin Act. "A statute must be read in a manner which furthers its purposes and avoids rendering the statute ineffectual" (American Lodge Assn. v East N.Y. Sav. Bank, 100 AD2d 281, 285 [2d Dept 1984]; see generally McKinney's Cons Laws of NY, Book 1, Statutes § 96 ["A basic consideration in the interpretation of a statute is the general spirit and purpose underlying its enactment, and that construction is to be preferred which furthers the object, spirit and purpose of the statute"]). Yet here the Court reads the CPLR and the Martin Act in a way that undermines the legislature's purpose. Worse still, that reading needlessly leads to incongruous results, directly in contravention of our settled case law and basic principles of statutory interpretation (see e.g. Statutes § 145 ["A construction which would make a statute absurd will be rejected"]; Matter of DeTroia v Schweitzer, 87 NY2d 338, 342 [1996] [observing that law "should be interpreted to avoid . . . objectionable, absurd, anomalous and unjust result(s)" (citations omitted)]). A construction that limits actions under the Martin Act to three years must be rejected as unsound.
[*19]III.
My colleagues also conclude that the statute of limitations applicable to claims brought under Executive Law § 63 (12) is determined by reference to the underlying liability asserted in the complaint (see majority op at 
633-634; concurring op at {**31 NY3d at 659}635). I agree with this general rule. However, my colleagues further conclude that actions brought by the Attorney General under Executive Law § 63 (12) for repeated violations of the Martin Act are subject to a three-year statute of limitations. That decision rests on the same flawed analysis upon which their adoption of a three-year statute of limitations for actions under the Martin Act is based, and so I reject it for the same reasons.
To the extent my colleagues conclude that the Attorney General can plead causes of action sounding in intentional or equitable fraud and get the benefit of the six-year statute of limitations by filing under Executive Law § 63 (12), because that statute permits a court to "look through" to the underlying cause of action, this does not minimize the harm done by the decision to limit the Martin Act to a three-year statute of limitations. Moreover, section 63 (12) applies to repeated fraudulent acts or persistent fraud, so in those cases where the Attorney General cannot prove repeated or persistent conduct, the causes of action will be dismissed as time-barred. This is unacceptable, and in clear contravention of the legislature's intent. Even fraud that is not proved to be persistent can cause significant harm to the securities market and individual investors.
IV.
For the reasons I have discussed, I would reaffirm what New York courts have consistently assumed—that causes of action filed pursuant to the Martin Act are subject to a six-year statute of limitations. Nevertheless, because four members of the Court have now concluded that the Attorney General's causes of action filed under the Martin Act are subject to a three-year statute of limitations, even for those causes of action grounded on fraud known to the courts at the time of the enactment of the statute, it now falls to the legislature to correct this error before significant damage is done to the State's securities markets. "What is needed"—now, as much as ever—"is a flexible, virile fraud-hunting State machinery" (Report at 14). For nearly a century, the Martin Act gave our great State just such machinery. Today, the Court grievously compromises this vital tool. Make no mistake, this is a significant decision with potentially devastating consequences for the People of the State{**31 NY3d at 660} of New York, as well as the markets beyond our borders, which depend on New York as a global financial center.[FN5]
Judges Stein, Fahey and Feinman concur; Judge Feinman in an opinion in which Judge Fahey concurs; Judge Rivera dissents in an opinion; Judges Garcia and Wilson taking no part.
Order modified, without costs, by granting that branch of defendants' motion which was to dismiss the first cause of action in the complaint pursuant to CPLR 3211 (a) (5) as time-barred and remitting the case to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed and certified question answered in the negative.

Footnotes

Footnote 1:During the investigation, the parties entered into a tolling agreement effective March 8, 2012 and, as a result, that date is treated as the date of commencement of the action for purposes of determining timeliness.

Footnote 2:The parties agree that although there are distinctions between CPLR 213 (1) and (8), those distinctions are immaterial in this case.

Footnote 1:We do not decide whether CPLR 214 (2) applies to criminal proceedings, or different types of civil claims, under the Martin Act. Our holding is compelled by the rule laid down in Gaidon v Guardian Life Ins. Co. of Am. (96 NY2d 201 [2001]), because "fraudulent practices" under General Business Law § 352 (1) and "[d]eceptive acts or practices" under General Business Law § 349 (a) are comparably broad in scope. While the dissent maintains that Gaidon "only considered the causes of action as pleaded" (dissenting op at 
657), this is generally not how Gaidon has been interpreted (see Fownes Bros. & Co., Inc. v JPMorgan Chase & Co., 92 AD3d 582, 583 [1st Dept 2012]; Pike v New York Life Ins. Co., 72 AD3d 1043, 1047-1048 [2d Dept 2010]; In re Libor-Based Fin. Instruments Antitrust Litig., 2015 WL 4634541, *155, 2015 US Dist LEXIS 107225, *522 [SD NY, Aug. 4, 2015, No. 11 MDL 2262 NRB], amended 2015 WL 13122396, 2015 US Dist LEXIS 147561 [SD NY, Oct. 19, 2015]; but see Matter of Coordinated Tit. Ins. Cases, 2 Misc 3d 1007[A], 2004 NY Slip Op 50171[U], *11 [Sup Ct, Nassau County 2004]; Williams v Dow Chem. Co., 2004 WL 1348932, *6, 2004 US Dist LEXIS 10940 [SD NY, June 16, 2004, No. 01 Civ. 4307(PKC)], reconsideration denied in part, granted in part 2004 WL 1907311, 2004 US Dist LEXIS 17046 [SD NY, Aug. 25, 2004]).

Footnote 2:Citing Del Vecchio v Nassau County (118 AD2d 615, 617-618 [2d Dept 1986]) and Roni LLC v Arfa (74 AD3d 442, 444-445 [1st Dept 2010]), Credit Suisse asserts that "equitable fraud" requires proof of the existence of a fiduciary duty or some other special relationship, the breach of which creates an "unconscientious advantage" impelling a court in equity to intervene. However, this argument rests on a confusion between what this Court referred to as "equitable fraud" in Federated Radio (244 NY at 41), on the one hand, and what courts have commonly referred to as "constructive fraud" (Roni, 74 AD3d at 444-445; Del Vecchio, 118 AD2d at 617-618; Brown v Lockwood, 76 AD2d 721, 730-731 [2d Dept 1980]), on the other. Despite their similar names—which simply derive from convention, as both actions are in fact equitable in nature—these two theories of liability are very different. Under the former, a plaintiff may bring an action for equitable rescission based on a material misrepresentation of fact that the plaintiff justifiably relied on and need not demonstrate the existence of a fiduciary duty (see Bloomquist, 222 NY 375 [rescission of arm's-length securities purchase]). The latter rests on the theory that, where the plaintiff was owed a fiduciary duty or duty of confidentiality by the defendant, they are warranted "to repose [their] confidence in the defendant and therefore to relax the care and vigilance [they] would ordinarily exercise in the circumstances" (Brown v Lockwood, 76 AD2d at 731). "The elements of a cause of action to recover for constructive fraud are the same as those to recover for actual fraud with the crucial exception that the element of scienter upon the part of the defendant, [their] knowledge of the falsity of [their] representation, is dropped" (id.; see Del Vecchio, 118 AD2d at 617-618). The remedy for a constructive fraud is not limited to rescission and may instead include damages (see Del Vecchio, 118 AD2d 615 [damages action on constructive fraud theory]; Brown, 76 AD2d 721 [same]).

Footnote 1:The Attorney General maintains that, because both CPLR 213 (1) and (8) apply the same limitations period, we need not decide which provision applies here. I agree, and because my colleagues analyze the issues presented in this appeal based solely on the complaint's assertion of fraudulent conduct, I limit my discussion to the applicability of section 213 (8) for an action based upon fraud.

Footnote 2:For ease of analysis, I refer to defendants interchangeably as "defendants," "Credit Suisse," and "the bank."

Footnote 3:CPLR 214 (2) also references CPLR 215, which imposes a one-year statute of limitations on a small number of specifically defined actions, including actions against a sheriff, coroner, or constable for acts taken in their official course of duty (see CPLR 215 [1]), actions to enforce an arbitration award (see CPLR 215 [5]), and certain actions by tenants (see CPLR 215 [7]), among others, all irrelevant to the issues before us here.

Footnote 4:These elements have remained unchanged across more than a hundred years (see e.g. Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 [2009] [listing the "elements of a cause of action for fraud" as "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages"]).

Footnote 5:Given my conclusion that causes of action under the Martin Act are subject to CPLR 213's six-year statute of limitations, I do not have occasion to opine on the statute of limitations applicable to actions brought under Executive Law § 63 (12), or my colleagues' discussion of this provision, other than to state the obvious: causes of actions under Executive Law § 63 (12) based on fraud recognized under decisional law at the time of that statute's enactment are subject to CPLR 213's six-year statute of limitations as well.